1  Andrew B. Downs, SBN 111435
   E-Mail: andy.downs@bullivant.com
2  Peter Roldan, SBN 227067
   E-Mail: peter.roldan@bullivant.com
3  BULLIVANT HOUSER BAILEY PC
   601 California Street, Suite 1800
4  San Francisco, California  94108
   Telephone: 415.352.2700
5  Facsimile: 415.352.2701

6  Attorneys for Plaintiff United States Fire
   Insurance Company
7

**ORIGINAL FILED**

MAY 2 9 2009

Richard W. Wieking
Clerk, U. . . District Court
Northern District of California
San Jose

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                  SAN JOSE DIVISION

11

12  UNITED STATES FIRE INSURANCE      Case No.: C 09  02388  JW PVT
    COMPANY, a corporation,
13                                    COMPLAINT FOR RESCISSION AND
                  Plaintiff,          DECLARATORY RELIEF
14
15       vs.

16  VESTA STRATEGIES, LLC, a limited liability
    company; SAMUEL W. HENKA, an
17  individual,

                  Defendants.
18

19       Plaintiff alleges:

20                  **JURISDICTION AND VENUE**

21       1.    This action is within the diversity jurisdiction of the court in that it is between

22  citizens of different states and the amount of controversy exceeds $75,000 as is more fully

23  shown below.

24       2.    Plaintiff United States Fire Insurance Company ("U.S. Fire") is a corporation

25  incorporated in Delaware with its principal place of business in New Jersey.  For purposes of

26  diversity jurisdiction, U.S. Fire is a citizen of both Delaware and New Jersey.

27

28

                          – 1 –
        COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF

3. Defendant Vesta Strategies, LLC ("Vesta") is California Limited Liability Company with its principal place of business in San Jose, California. For purposes of diversity jurisdiction, Vesta is a citizen of California.

4. Defendant Samuel W. Henka ("Henka") is a natural person who resides in California. For purposes of diversity jurisdiction, Henka is a citizen of California.

5. This action concerns two first party policies of Commercial Crime Insurance, each of which has per occurrence policy limits of $2,000,000. U.S. Fire is informed and believes that the losses alleged to have occurred exceed $2,000,000. Thus, the amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

6. Venue is appropriate in the Northern District of California, and more particularly in the San Jose Division of this district, because Vesta is headquartered in San Jose and the conduct underlying this lawsuit took place in the Northern District of California.

## PRELIMINARY ALLEGATIONS

7. Effective August 19, 2005, U.S. Fire issued a Commercial Crime Policy, number 626-030096-4 to Vesta Strategies, LLC for the period from August 19, 2005, to August 19, 2006 (the "2005-2006 policy"). A true and correct copy of that policy is attached as Exhibit A.

8. Effective July 19, 2006, U.S. Fire issued a Commercial Crime Policy, number 626-030403-3 to Vesta Strategies, LLC for the period from July 19, 2006 to July 19, 2007 (the "2006-2007 policy"). A true and correct copy of that policy is attached as Exhibit B.

9. On December 7, 2007, Vesta filed an action in this court entitled *"Vesta Strategies, LLC v. Robert E. Estupinian, et al"* Action Number C 07-06126 JW (the "Estupinian lawsuit"). On December 17, 2007, Vesta filed a Second Amended Complaint in that action. A true and correct of that Complaint is attached as Exhibit C.

10. In its Second Amended Complaint in the Estupinian lawsuit, Vesta alleges that Robert Estupinian, the CEO of Vesta, and Ginny Estupinian, an alleged employee of Vesta, embezzled and stole money from Vesta. Vesta alleges that on June 7, 2004, Robert Estupinian took $1,256,150 from Vesta and used it for the purchase of a personal residence (¶ 22). Vesta further alleges that the use of the money was unauthorized.

11. Vesta also alleges in its Second Amended Complaint that commencing in 2004 Robert Estupinian used Vesta's money to rent an apartment in Long Beach, California (¶ 26). Vesta further alleges that Robert Estupinian lied about the purpose of that expenditure of Vesta funds and that the expenditures were unauthorized (¶¶ 28 and 29).

12. In its Second Amended Complaint, Vesta alleges that Robert Estupinian used Vesta Strategies to pay commissions that a company owned by Robert Estupinian, Millennium Realty Group, owed to third parties (¶¶ 51 and 52). Among other transactions alleged by Vesta are the payment of $14,000 on March 15, 2005 for a real estate commission (¶ 53).

13. In its Second Amended Complaint in the Estupinian lawsuit, Vesta alleges that Robert Estupinian took over $12,000,000 from Vesta over a three year period ending in late 2007. Further Vesta alleges that Mr. Estupinian received the interest earned on those funds, not Vesta (¶ 69).

14. Vesta also alleges in its Second Amended Complaint, that between 2004 and 2007, Robert Estupinian engaged in a pattern of activity adverse to Vesta which constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c) (¶ 83).

15. On or about April 9, 2008, Robert Estupinian and others filed a First Amended Counterclaim and First Amended Third-Party Complaint (the "Estupinian Counterclaim") in the Estupinian lawsuit against Vesta and John Terzakis ("Terzakis"), whom they allege was the 51% managing member of Vesta, and others. A true and correct copy of the Estupinian Counterclaim is attached as Exhibit D.

16. In the Estupinian Counterclaim, Robert Estupinian further alleges that since 2004 Terzakis has converted and distributed to himself over $25,000,000 of Vesta's funds (¶ 31).

17. In the Estupinian Counterclaim, Robert Estupinian further alleges that in 2004 Vesta was refused admission to a trade association, the Federation of Exchange Accommodators because of Terzakis' "questionable character" (¶ 39).

18. On or about January 9, 2002, Portola Investments, Manchester Investments, F.C. Investments, and David H. Malcom, Successor Trustee of the Jensen Family Trust filed a complaint in the Superior Court of the State of California for the County of Santa Clara against

– 3 –

1   Investment Advantage Group, LLC, John Terzakis, Robert Estupinian and others (Terzakis and
2   Estupinian were added as defendants by amendment to that complaint). In that action, Portola
3   and the other plaintiffs alleged that Investment Advantage Group was a Qualified Intermediary
4   and that it had failed to fund an exchange for Portola and the other plaintiffs. U.S. Fire is
5   informed and believes that Vesta is the successor to Investment Advantage Group in that it has
6   the same principals (Terzakis and Estupinian) and the same toll-free telephone number, and that
7   for some time after the Vesta name began to be used, it occupied the same office space and used
8   the same website domain www.iag1031.com.

9       19.     On or about June 8, 2005, Vesta executed an application for insurance, a true and
10  correct copy of which is attached as Exhibit E. That application was eventually submitted to
11  U.S. Fire when Vesta sought to purchase insurance. Where application asked about fidelity or
12  crime losses discovered or reported in the past three years Vesta responded "None." Based on
13  the allegations made by Vesta in the Estupinian lawsuit and those made by Robert Estupinian in
14  the Estupinian Counterclaim, that answer was false.

15      20.     In addition, California law required that Vesta disclose all material facts in its
16  application related to the risk that Vesta was asking U.S. Fire to insure. The facts alleged both
17  by Vesta in the Estupinian lawsuit and by Robert Estupinian in the Estupinian Counterclaim
18  were material facts that Vesta was legally obligated to disclose to U.S. Fire when it applied for
19  commercial crime coverage. Likewise, Vesta had an obligation to notify U.S. Fire of the
20  circumstances of the lawsuit by Portola.

21      21.     On or about July 12, 2006, Vesta submitted an application to U.S. Fire for a
22  renewal of the commercial crime policy that had been issued in 2005, a true and correct copy of
23  which is attached as Exhibit F. In that application, Vesta again affirmatively represented that it
24  had had no losses in the past six years. In addition, Vesta did not disclose the facts alleged by
25  Vesta in the Estupinian lawsuit and by Robert Estupinian in the Estupinian Counterclaim.
26  Those were material facts that Vesta was legally obligated to disclose to U.S. Fire when it
27  applied for commercial crime coverage. And again, despite its legal obligations to the contrary,
28  Vesta failed to disclose the circumstances which led to Portola's lawsuit.

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF

22.     On or about February 13, 2009, Henka submitted a claim to U.S. Fire under the commercial crime policies issued to Vesta. A true and correct copy of that claim is attached as Exhibit G. In that claim, Henka claims to be a third-party beneficiary of the commercial crime policies issued to Vesta and seeks recovery under those policies. Prior to the claim by Henka, U.S. Fire had received no claim from Vesta or anyone associated with it.

**FIRST CLAIM FOR RELIEF (RESCISSION 2005-2006 POLICY)**

23.     U.S. Fire realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 22 of this Complaint as if those paragraphs were repeated in full at this point.

24.     In applying for the 2005-2006 policy, Vesta misrepresented material facts regarding the risk which it was asking U.S. Fire to insure.

25.     In applying for the 2005-2006 policy, Vesta failed to disclose material facts regarding the risk which it was asking U.S. Fire to insure.

26.     Under California law, Vesta had a duty not to misrepresent material facts and to disclose all material facts. In applying for the 2005-2006 policy, Vesta breached these duties.

27.     Vesta's breach of its duties entitles U.S. Fire to rescind the 2005-2006 policy. U.S. Fire has notified Vesta that it is rescinding the 2005-2006 policy.

WHEREFORE, U.S. Fire prays for entry of judgment as set forth below:

**SECOND CLAIM FOR RELIEF (RESCISSION 2006-2007 POLICY)**

28.     U.S. Fire realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 22 of this Complaint as if those paragraphs were repeated in full at this point.

29.     In applying for the 2006-2007 policy, Vesta misrepresented material facts regarding the risk which it was asking U.S. Fire to insure.

30.     In applying for the 2006-2007 policy, Vesta failed to disclose material facts regarding the risk which it was asking U.S. Fire to insure.

31.     Under California law, Vesta had a duty not to misrepresent material facts and to disclose all material facts. In applying for the 2006-2007 policy, Vesta breached these duties.

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF

1    32.    Vesta's breach of its duties entitles U.S. Fire to rescind the 2006-2007 policy.

2    U.S. Fire has notified Vesta that it is rescinding the 2006-2007 policy.

3    WHEREFORE, U.S. Fire prays for entry of judgment as set forth below:

4    **THIRD CLAIM FOR RELIEF (DECLARATORY JUDGMENT)**

5    33.    U.S. Fire realleges and incorporates by reference each and every allegation

6    contained in paragraphs 1 through 22 of this Complaint as if those paragraphs were repeated in

7    full at this point.

8    34.    An actual controversy has arisen between U.S. Fire, Henka and Vesta in that

9    Henka, and perhaps Vesta as well, contend that U.S. Fire is obligated to make payment under

10   the 2005-2006 and 2006-2007 policy for losses incurred by Henka and others who are similarly

11   situated.

12   35.    U.S. Fire denies that Henka is an insured or a third-party beneficiary under the

13   policy and it further denies that Henka has any rights under either of the U.S. Fire policies.

14   36.    In addition, the policies only cover losses discovered during the policy periods.

15   Mr. Henka did not deposit his funds with Vesta until after the last U.S. Fire policy expired on

16   July 19, 2007.

17   37.    The policies also require that Vesta give U.S. Fire prompt notice of losses and

18   that it submit Proofs of Loss within 120 days of discovery of the loss. Vesta did not comply

19   with these provisions.

20   38.    The coverage provided for loss of exchanger funds due to employee dishonesty is

21   provided by and subject to the terms of the Tax-Deferred Exchange Endorsement which requires

22   that Vesta maintain certain internal procedures and controls. Based on the information available

23   to U.S. Fire, U.S. Fire is informed and believes that Vesta did not maintain the internal

24   procedures and controls which it was contractually obligated to maintain.

25   39.    The policies also contain two year suit time clauses. The first notice to U.S. Fire

26   of any claim under the policy was a letter dated February 13, 2009 from Henka's attorneys.

27   Any claim for a loss discovered before February 13, 2007 is time-barred.

28

– 6 –

1    40.    U.S. Fire is informed and believes that discovery may uncover evidence to

2 support additional defenses to coverage, and U.S. Fire reserves all rights available to it to amend

3 this complaint or to assert additional defenses to coverage.

4    41.    U.S. Fire seeks a declaration that the losses claimed by Henka, as well as any

5 losses that may be claimed by Vesta in the future are not covered by either of the U.S. Fire

6 policies.

7    WHEREFORE, plaintiff United States Fire Insurance Company prays for judgment as

8 follows:

9    1.    For a judgment rescinding the 2005-2006 policy issued by U.S. Fire;

10    2.    For a judgment rescinding the 2006-2007 policy issued by U.S. Fire;

11    3.    For a judgment declaring that Henka has no right to recover under the 2005-2006

12 policy issued by U.S. Fire;

13    4.    For a judgment declaring that Henka has no right to recover under the 2006-2007

14 policy issued by U.S. Fire;

15    5.    For a judgment declaring that Vesta has no right to recover under the 2005-2006

16 policy issued by U.S. Fire;

17    6.    For a judgment declaring that Vesta has no right to recover under the 2006-2007

18 policy issued by U.S. Fire;

19    7.    For costs of suit; and

20    8.    For such other relief as is appropriate.

21 DATED:  May 29, 2009

22    BULLIVANT HOUSER BAILEY PC

23

24    By

25    Andrew B. Downs, SBN 111435
      Peter Roldan, SBN 227067

26    Attorneys for Plaintiff United States Fire Insurance
      Company

27 11287889.1

28

— 7 —

COMPLAINT FOR RESCISSION AND DECLARATORY RELIEF

# EXHIBIT A

# EXHIBIT A

DANIEL E. ALBERTI (68620)
dalberti@mwe.com
McDERMOTT WILL & EMERY LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone:     650.813.5000
Facsimile:     650.813.5100

PAUL E. CHRONIS
pchronis@mwe.com
ARON J. FRAKES
ajfrakes@mwe.com
McDERMOTT WILL & EMERY LLP
227 West Monroe Street
Chicago, Illinois 60606
Tel: (312) 372-2000
Fax: (312) 984-7700

Attorneys for Plaintiff
VESTA STRATEGIES, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VESTA STRATEGIES, LLC, | CASE NO.  C 07-06216 JW RS |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | |
| ROBERT E. ESTUPINIAN, GINNY ESTUPINIAN, MUTUAL VISION, LLC, MILLENNIUM REALTY GROUP, VESTA REVERSE 100, LLC, VESTA CAPITAL ADVISORS, LLC, and CAROL-ANN TOGNAZZINI, | |
| Defendants. | |

## <u>AMENDED COMPLAINT</u>

Plaintiff, Vesta Strategies, LLC ("Vesta Strategies"), by its undersigned attorneys, states as follows for its Complaint against defendants, Robert E. Estupinian, Ginny Estupinian, Mutual Vision, LLC ("Mutual Vision"), Millennium Realty Group ("Millennium"), Vesta Reverse 100, LLC ("Vesta Reverse"), Vesta Capital Advisors, LLC ("Vesta Capital"), and Carol-Ann Tognazzini ("Tognazzini").

### NATURE OF THE ACTION

1.     Robert Estupinian was the CEO of Vesta Strategies.  Since Vesta Strategies'
inception, Robert Estupinian, his wife Ginny Estupinian, and his private companies have
systematically and habitually breached their fiduciary and other legal duties to Vesta Strategies by
embezzling and stealing Vesta Strategies' money and causing Vesta Strategies millions of dollars
of damages.  Robert Estupinian's wrongful and unlawful conduct included but was not limited to:

- He stole Vesta Strategies' money to finance his and his wife's lavish lifestyle and to fund his own personal business ventures.

- He stole Vesta Strategies' money to buy two dogs for $50,000.

- He stole Vesta Strategies' money to personally rent an over $3,000 per month luxury oceanfront vacation apartment for years.

- He stole Vesta Strategies' money to throw extravagant parties for his wife.

- He stole Vesta Strategies' money to buy properties in his and his wife's name and then, when the properties did not make as much money as he wanted, he deeded them to Vesta Strategies.

- He stole Vesta Strategies' money to pay for his tuition to go to school for his PhD.

- He stole Vesta Strategies' money to buy his personal house.

- He stole Vesta Strategies' money to give to his parents as part of one of their real estate deals.

- He stole Vesta Strategies' money to pay so-called "referral fees" to his other companies and to pay commissions owed by his other companies.

- He stole Vesta Strategies' money to pay purported Vesta Strategies employees who did no work for Vesta Strategies.

2.     Vesta Strategies' 51% majority member and manager only recently learned about
Robert Estupinian's embezzlement, misappropriation, and misuse of Vesta Strategies' money.
That is because Robert Estupinian affirmatively and fraudulently hid what he was doing and
directed other Vesta Strategies' employees to mislead Vesta Strategies' controlling member and
manager, falsify records, and mischaracterize transactions to hide Robert Estupinian's theft.

McDermott Will & Emery LLP
Attorneys at Law
Palo Alto

AMENDED COMPLAINT                                - 2 -                    CASE NO. C 07-06216 JW RS

1    3.    Vesta Strategies brings this action against Robert Estupinian, his wife, his other

2    companies, and other individuals who have benefited from Robert Estupinian's theft and who

3    have wrongfully and unjustly received Vesta Strategies' money.  Vesta Strategies seeks to

4    expeditiously recover the millions of dollars that have been wrongfully taken from it.

### JURISDICTION AND VENUE

6    4.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28

7    U.S.C. § 1367, and 18 U.S.C. § 1964.

8    5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that a substantial

9    portion of the events giving rise to this action occurred in San Jose, Santa Clara County,

10   California..

### JURY DEMAND

12   6.    Vesta Strategies demands a trial by jury.

### PARTIES

14   7.    Plaintiff Vesta Strategies is a California limited liability company.  Vesta

15   Strategies' offices are located at 150 Almaden Boulevard, Suite 1375, San Jose, California.

16   8.    Defendant Mutual Vision is a 49% minority member of Vesta Strategies.  Upon

17   information and belief, Mutual Vision's members are defendants Robert and Ginny Estupinian.

18   Mutual Vision is located in Campbell, California.

19   9.    Defendant Robert Estupinian is the former CEO of Vesta Strategies.  Robert

20   Estupinian received an annual salary from Vesta Strategies of $250,000.  Robert Estupinian has

21   numerous degrees, including a BA (Bachelor of Arts), MBA (Masters of Business

22   Administration), and JD (Juris Doctor).  He also has numerous professional designations,

23   including as a RFC (Registered Financial Consultant), GRI (Graduate Realtor Institute), and CRS

24   (Certified Residential Specialist).  Moreover, he holds numerous licenses, including a Real Estate

25   broker license, an Insurance broker license, and a Registered Representative of Securities – Series

26   22, 6, 63 and Variable Contracts.  Robert Estupinian resides in San Jose, California.

27   10.    Defendant Ginny Estupinian is Robert Estupinian's wife.  Ginny Estupinian is a

28   former employee of Vesta Strategies.  Despite performing little work for Vesta Strategies, Ginny

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1    Estupinian received an annual salary from Vesta Strategies of $96,000. Upon information and

2    belief, Ginny Estupinian has a Bachelors degree in Business Administration and is in the process

3    of obtaining a PhD in psychology. Ginny Estupinian resides in San Jose, California.

4         11.    Defendant Millennium is an investment property brokerage company that is, upon

5    information and belief, owned and operated by Robert Estupinian. Millennium is located in San

6    Jose, California.

7         12.    Defendant Vesta Reverse is a limited liability company in which Mutual Vision is

8    the majority member. Vesta Reverse is operated by Robert Estupinian. Vesta Reverse was used

9    to funnel money out of Vesta Strategies for the personal benefit of Robert and Ginny Estupinian.

10   Vesta Reverse is located in San Jose, California.

11        13.    Defendant Vesta Capital is a limited liability company that is operated by Robert

12   Estupinian. Vesta Capital was used to funnel money out of Vesta Strategies to make investments

13   to benefit Robert and Ginny Estupinian. Vesta Capital is located in San Jose, California.

14        14.    Defendant Tognazzini is a close personal friend of Ginny Estupinian. Tognazzini

15   has been on Vesta Strategies' payroll since December, 2006 under Robert Estupinian's direction,

16   but Tognazzini did not do any work for Vesta Strategies. Instead, upon information and belief,

17   she was on Vesta Strategies' payroll solely to allow her to state that she was employed and had

18   income in order qualify for a loan to purchase a house. Upon information and belief, Tognazzini

19   resides in Rio Linda, California.

20                    **OPERATIVE FACTS APPLICABLE TO ALL COUNTS**

21        15.    Vesta Strategies was formed on January 9, 2004. Vesta Strategies is a qualified

22   intermediary for Section 1031 tax-deferred real estate exchanges. In essence, a qualified

23   intermediary for Section 1031 exchanges works with persons owning investment properties to

24   help them complete their Section 1031 exchange. In performing its services, a qualified

25   intermediary collects deposits from its customers and, at the appropriate time, has an obligation to

26   pay those funds out to the customer.

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

16.    Mutual Vision has been the minority member of Vesta Strategies at all relevant times. Robert Estupinian is the President of Mutual Vision. He and his wife Ginny Estupinian are, upon information and belief, the only members of Mutual Vision.

**The Estupinians Funded Their Lavish Lifestyle from Vesta Strategies' Bank Account**

17.    Robert Estupinian was the CEO of Vesta Strategies. Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and abused his position to fund his and his wife's extravagant lifestyle. Indeed, Robert and Ginny Estupinian treated Vesta Strategies as their own personal bank account.

**Robert Estupinian Used Vesta Strategies Funds to Buy Two Dogs for $50,000.**

18.    From August, 2006 through June, 2007, Robert Estupinian caused $170,000 to be transferred from Vesta Strategies to Mutual Vision (the minority member in Vesta Strategies). He used the money in two ways. He spent $50,000.00 on two dogs. And he put $118,000 into his and his wife's personal bank account.

19.    Mutual Vision, Robert Estupinian, and Ginny Estupinian have never paid that $170,000 or any interest back to Vesta Strategies.

20.    Notwithstanding the fact that Vesta Strategies' manager and majority member did not know about it, did not approve it, and never would have approved it, Robert Estupinian bought dogs and took money for his own personal account. The dogs and Robert Estupinian's bank account have no legitimate connection to Vesta Strategies' business.

**The Estupinians Used Vesta Strategies Funds to Buy Their House.**

21.    On June 7, 2004, Robert Estupinian took $1,256,150 out of Vesta Strategies. One week later, on June 14, 2004, he used that money to buy his house, with cash at closing, for $1,295,000. Amazingly, the Estupinians then used their personal company Millennium as their purported agent on the transaction and collected $38,850 as a commission for the transaction. In other words, the Estupinians bought a $1.3 million house without paying a dime. In fact, the Estupinians actually *made* money on their purchase of their million-dollar house.

22.    Mutual Vision, Robert Estupinian, and Ginny Estupinian have not paid all of this $1,256,150 back to Vesta Strategies and have not paid any interest on that money.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1        23.    Robert Estupinian affirmatively hid the purpose for which the $1,256,150 was

2  being transferred out of Vesta Strategies.

3        24.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

4  not know about it, did not approve it, and never would have approved it, the Estupinians bought a

5  house with Vesta Strategies' money.  The Estupinians' house has no legitimate connection to

6  Vesta Strategies' business.

7            **The Estupinians Used Vesta Strategies Funds to Rent a Luxury Apartment.**

8        25.    Since 2004, the Estupinians have also rented a luxury, oceanfront apartment in

9  Long Beach, California.  The rent for that luxury apartment has ranged from $3,050 to $3,379 per

10  month.  Despite how expensive it is, Robert and Ginny Estupinian have, on information and

11  belief, spent a maximum of several weeks per year at that apartment.  Vesta Strategies has paid

12  for the rent, furniture, and utilities (including electricity, gas, water, satellite television, and

13  cleaning services) for Robert and Ginny Estupinian's personal, luxury, beachfront apartment.

14  Specifically, Vesta Strategies has paid over $160,308 in rent, furnishings, and utilities for that

15  apartment.

16        26.    Robert and Ginny Estupinian have never paid that money back to Vesta Strategies.

17        27.    The Estupinians lied to Vesta Strategies and its controlling member and manager

18  about the purpose for this rent.  Indeed, Robert Estupinian submitted expense reports for

19  apartment expenses under the guise that they were for the "Long Beach Office," which did not

20  exist.

21        28.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

22  not know about it, did not approve it, and never would have approved it, the Estupinians have

23  personally rented a luxury vacation apartment using Vesta Strategies' money.  The Estupinians'

24  luxury apartment has no legitimate connection to Vesta Strategies' business.

25            **Robert Estupinian Used Vesta Strategies Funds to Go to School.**

26        29.    From 2005 through 2007, Robert Estupinian has attended Walden University to

27  seek his PhD.  He used Vesta Strategies to pay his tuition and other costs.  Specifically, Vesta

28  Strategies has paid $42,795 for Robert Estupinian to go to Walden University.

1        30.    Robert Estupinian has never paid any of the money that he used for his school

2    tuition and costs back to Vesta Strategies.

3        31.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

4    not know about it, did not approve it, and never would have approved it, Robert Estupinian went

5    to school on Vesta Strategies' money.  Robert Estupinian's schooling had no legitimate

6    connection to Vesta Strategies' business.

7            **The Estupinians Used Vesta Strategies Funds to Throw Extravagant Parties.**

8        32.    Robert Estupinian threw extravagant parties, including birthday parties for his

9    wife.  The Estupinian's invited their friends and family to the swanky Fairmont Sonoma Mission

10    Inn and Spa for the weekend.  The Estupinians would treat their friends to fancy lodging, dinners,

11    spa treatments, and other events.  The Estupinians and their friends would run up a tab of

12    thousands of dollars, which Robert Estupinian would pick up.  The reason that Robert Estupinian

13    was such a big spender is clear:  he was not spending his own money.  He was spending Vesta

14    Strategies' money.  Vesta Strategies paid for these lavish parties, to the tune of over $9,313.

15    Robert and Ginny Estupinian have never paid that money back to Vesta Strategies.

16        33.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

17    not know about it, did not approve it, and never would have approved it, Robert Estupinian threw

18    personal parties using Vesta Strategies' money.  The Estupinian's personal parties with their

19    friends and family had no legitimate connection to Vesta Strategies' business.

20    **Robert Estupinian Used Vesta Strategies to Pay Sham Payroll to Ginny Estupinian's Friend**

21        34.    Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and

22    abused his position to pay money to his wife's friend with no return benefit to Vesta Strategies.

23    This particular scam involved the Estupinians' efforts to help their friend trick lenders into

24    believing that she had an employment history and income so that she could get a loan.

25        35.    On December 21, 2006, Robert Estupinian put Tognazzini (Ginny Estupinian's

26    friend) on Vesta Strategies' payroll.  Tognazzini was paid an annual salary of $36.480.  However,

27    Vesta Strategies is not aware of *any* work that Tognazzini did for Vesta Strategies.  To the extent

28    that she did anything for Vesta Strategies, it certainly did not justify her salary.

---

AMENDED COMPLAINT                          - 7 -                    CASE NO. C 07-06216 JW RS

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1      36.    Upon information and belief, prior to her purported employment with Vesta

2   Strategies, Tognazzini was unemployed.

3      37.    Upon information and belief, Tognazzini has been in the market to purchase a

4   house. If she was unemployed, and did not have any income, then Tognazzini would not have

5   qualified for a loan to purchase a house. Upon information and belief. Robert Estupinian put

6   Tognazzini on the Vesta Strategies payroll and paid her income solely so that Tognazzini could

7   show lenders that she was employed and qualify for a loan.

8      38.    Tognazzini's alleged employment with Vesta Strategies was nothing more than a

9   sham to trick mortgage companies into believing that she was employed and had a steady stream

10   of income.

11      39.    In addition to helping their friend defraud banks, the Estupinians also had a selfish

12   interest in Tognazzini qualifying for a mortgage to purchase a house. Indeed, upon information

13   and belief, the Estupinians expected to serve as agents or brokers for Tognazzini's home purchase

14   and to pocket a significant commission as a result.

15      40.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

16   not know about it, did not approve it, and never would have approved it, Robert Estupinian

17   caused Vesta Strategies to pay a significant salary to a person who did no work for Vesta

18   Strategies.

19   **Robert Estupinian Paid Other People from Vesta Strategies for Non-Vesta Work**

20      41.    Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and

21   abused his position to pay substantial amounts of money to individuals who were not doing

22   significant work for Vesta Strategies.

23      42.    For example, Bill Kraft, Brad Hensley, and David Carter worked directly for

24   Robert Estupinian or for one of Estupinian's other companies, including Millennium. In that

25   capacity, those individuals performed real estate sales and broker services.

26      43.    Vesta Strategies is a company that acts as a qualified intermediary for Section

27   1031 real estate exchanges.

28

MC DERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

AMENDED COMPLAINT                    - 8 -                    CASE NO. C 07-06216 JW RS

44. Bill Kraft, Brad Hensley, and David Carter have spent the vast majority of their time assisting Robert Estupinian with his business of selling tenant in common interests in real estate, rather than working for Vesta Strategies in its qualified intermediary business.

45. However, despite the fact that they spent the majority of their time doing business other than Vesta Strategies business, Robert Estupinian used Vesta Strategies to pay Bill Kraft, Brad Hensley, and David Carter. At Robert Estupinian's direction, Vesta Strategies paid significant wages to those individuals, when those wages should have been paid by Robert Estupinian's other companies.

46. Notwithstanding the fact that Vesta Strategies' manager and majority member did not know about it, did not approve it, and never would have approved it, Robert Estupinian Robert Estupinian used Vesta Strategies to make payroll payments to individuals who were in reality working directly for him or his other companies and who were not performing significant services for Vesta Strategies.

**Robert Estupinian Used Vesta Strategies to Further His Wife's Education and Career**

47. Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and abused his position to cause Vesta Strategies to pay money to support Ginny Estupinian's psychology education and career.

48. For example, at Robert Estupinian's direction, the so-called Vesta Strategies Foundation made a $6,000 grant to a psychology research group in order to conduct a certain psychology study. That grant was made using Vesta Strategies' money. Ginny Estupinian served as the project coordinator for that study.

49. Notwithstanding the fact that Vesta Strategies' manager and majority member did not know about it, did not approve it, and never would have approved it, Robert Estupinian funded a psychology study. That psychology study had no relation to, and provided no benefit to, Vesta Strategies' real estate business.

McDermott Will & Emery LLP
Attorneys at Law
Palo Alto

**Robert Estupinian Used Vesta Strategies to Pay Obligations of His Personal Companies**

50.     Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and abused his position to cause Vesta Strategies to pay obligations owed by Millennium, not Vesta Strategies.

51.     Robert Estupinian owned and operated Millennium, a company that performs real estate brokerage and investments services. Unlike Vesta Strategies, Millennium is not a Section 1031 qualified intermediary.

52.     Robert Estupinian used Vesta Strategies funds to pay the commissions that Millennium owed to its sales people. Specifically, Robert Estupinian caused Vesta Strategies to pay at least the following commissions that Millennium was obligated to pay: (1) $14,000 on March 15, 2005 for a Real Estate Commission; (2) $16,000 on December 15, 2006 for a Securities Commission; (3) $14,160 on December 15, 2006 for a Securities Commission; (4) $5,000 on June 15, 2007 for a Real Estate Commission; (5) $5,000 on July 15, 2007 for a Real Estate Commission; (6) $5,000 on August 15, 2007 for a Real Estate Commission; and (7) $5,000 on August 15, 2007 for a Securities Commission. Therefore, at Robert Estupinian's direction, Vesta Strategies is out $64,160 for commissions that had nothing to do with Vesta Strategies. Meanwhile, Robert Estupinian's other company, Millennium, kept 100% of the commission that it collected for the transactions.

53.     Similarly, Robert Estupinian caused Vesta Strategies to pay Brad Hensley at least $5,000 on August 15, 2006 and $14,160 on December 15, 2006 as alleged Securities Commissions. Again, these commissions related to transactions that had nothing to do with Vesta Strategies' qualified intermediary business. Therefore, at Robert Estupinian's direction, Vesta Strategies is out $19,160 for commissions paid to Brad Hensley that had nothing to do with Vesta Strategies.

54.     Vesta Strategies did not owe Millennium's commissions and those commissions should not have been paid by Vesta Strategies.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1    55.    Millennium and Robert Estupinian have never paid any money back to Vesta

2    Strategies that was paid by Vesta Strategies for commissions owed by Millennium or Robert

3    Estupinian.

4    56.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

5    not know about it, did not approve it, and never would have approved it, Robert Estupinian paid

6    the debts of his personal companies using Vesta Strategies funds.  Those payments had no

7    legitimate connection to Vesta Strategies' business.

8    **Robert Estupinian Caused Vesta Strategies to Pay Phony Fees to His Other Companies**

9    57.    Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and

10   abused his position to cause Vesta Strategies to pay phony "referral fees" to his other companies.

11   58.    Indeed, at Robert Estupinian's direction, Vesta Strategies has paid $630,100 in so-

12   called referral fees to Millennium.  However, Millennium did not refer anything to Vesta

13   Strategies or perform any other services to earn that $630,100.  The referral fees were phony.

14   They were simply a disguise to shuttle money from Vesta Strategies to Millennium at Robert

15   Estupinian's whim.

16   59.    Robert Estupinian and Millennium were not entitled to the $630,100 paid to them

17   by Vesta Strategies.  However, they have never returned that money to Vesta Strategies.

18   60.    Robert Estupinian hid these phony referral fees by falsifying financial records to

19   show income that did not exist to cover these expenses.

20   61.    Notwithstanding the fact that Vesta Strategies' manager and majority member did

21   not know about it, did not approve it, and never would have approved it, Robert Estupinian paid

22   referral fees to Millennium that Vesta Strategies did not owe.  Those payments had no legitimate

23   connection to Vesta Strategies' business.

24   **Robert Estupinian Used Vesta Strategies' Money to Make His Own Investments**

25   62.    Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and

26   abused his position to use Vesta Strategies' money to make his own personal investments,

27   investments for his family, and investments for his other business.

28

AMENDED COMPLAINT                              - 11 -                    CASE NO. C 07-06216 JW RS

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

**The Estupinians Buy Personal Real Estate Investments with Vesta Strategies Funds.**

63.     Vesta Reverse 100, LLC (a company set up by Robert Estupinian) borrowed $750,000 from Vesta Strategies. Robert Estupinian used that money to purchase vacant lots in South Carolina (Lots 683, 687, 688). However, he did not purchase those lots for Vesta Strategies. Indeed, Vesta Strategies is a Section 1031 exchange business, it is not a real estate investment business. Rather, he purchased them for himself and his wife.

64.     Specifically, the Settlement Statements confirm that Robert and Ginny Estupinian personally purchased Lots 683, 687, and 688 for $230,000, $260,000, and $260,000, respectively, on or about September 20, 2005.

65.     Ultimately, when that speculative investment apparently did not work out as he had hoped, Robert Estupinian then transferred the deeds of the properties to Vesta Strategies. Simply put, Robert Estupinian and Ginny Estupinian used Vesta Strategies to fund their speculative real estate investment and then, when they did not make the Estupinians as much money as they hoped, dumped the properties on Vesta Strategies to deal with.

**Robert Estupinian Gave Vesta Strategies Funds to His Parents.**

66.     On October 4, 2007, Mutual Vision (Vesta Strategies' minority member) transferred $43,369.30 to a title company for a transaction involving Robert Estupinian's parents, Edmundo and Haydee Estupinian. Upon information and belief, Mutual Vision's sole or primary source of revenue is Vesta Strategies. Based on that fact, and on Mutual Vision's and the Estupinians' pattern of using Vesta Strategies' money to pay for things, Vesta Strategies believes that the $43,369.30 is Vesta Strategies funds.

67.     Robert Estupinian's parents had nothing to do with Vesta Strategies, and certainly did not provide any benefit to Vesta Strategies. Yet, upon information and belief, Robert Estupinian caused Vesta Strategies to give them $43,369.30.

**Robert Estupinian Used Vesta Strategies Funds to Make High-Risk Mezzanine Loans.**

68.     Since its formation, through his personal companies, Robert Estupinian has also borrowed over $12 million from Vesta Strategies. Robert Estupinian used Vesta Strategies' money to make his own investments or investments for his other companies.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1    69.    This was the scam: Robert Estupinian "borrows" money from Vesta Strategies at

2    a low interest rate. He then puts that money into an investment yielding a higher rate of return –

3    typically high-risk mezzanine financing at over 10% interest – on his own behalf (or using one of

4    his other companies). He then pays the principal back to Vesta Strategies, and pockets the

5    substantial interest spread. So Robert Estupinian gets all of the benefit of the money (the

6    interest), while bearing none of the risk because he is using Vesta Strategies' money.

7    70.    Upon information and belief, Robert Estupinian has wrongfully and improperly

8    received approximately $250,000 to $300,000 in interest per year for at least three years using

9    Vesta Strategies' money. Vesta Strategies was entitled to the use of its money, and the time value

10   of that money, during that period of time.

11   **Robert Estupinian Submitted Improper Expense Reports to Vesta Strategies**

12   71.    Instead of acting in Vesta Strategies' best interests, Robert Estupinian used and

13   abused his position to submit and collect upon improper expense reports to Vesta Strategies. He

14   expensed costs that had nothing whatsoever to do with Vesta Strategies' business, but rather were

15   Robert Estupinian's personal costs or costs incurred in operating his other businesses.

16   72.    The following are just a few among many egregious examples of improper items

17   that Robert Estupinian expensed through Vesta Strategies:

18
     • Materials for a "Life Marketing Package" that had nothing whatsoever to
       do with Vesta Strategies' business;
19
20   • A subscription to Rob Minton's Monthly Income for Life newsletters,
       which was wholly unrelated to Vesta Strategies' business;

21   • Materials to develop a membership style website that was wholly unrelated
       to Vesta Strategies' business;
22
23   • Marketing expenses that had nothing whatsoever to do with Vesta
       Strategies' business;

24   • Real estate and securities memberships that had nothing whatsoever to do
       with Vesta Strategies' business;
25
26   • Subscriptions to entrepreneurial organizations that had nothing to do with
       Vesta Strategies' business; and

27   • Personal meetings and dinners, including frequent dinners with his wife
       and dinners or meetings that did not occur at all.
28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1    73.    Robert Estupinian collected improper expense payments from Vesta Strategies in

2    an amount exceeding $432,776.

3    74.    Robert Estupinian affirmatively hid the true nature of these expenses in his

4    expense reports, including for example by submitting expense reports for dinners with his wife

5    using her maiden name (Hillig) rather than her married name (Estupinian).

6    ### COUNT I – RICO UNDER 18 U.S.C. § 1962(c)
     **Against Robert Estupinian and Ginny Estupinian**

7

8    75.    Vesta Strategies incorporates the allegations of paragraphs 1 through 74 above as

9    if fully set forth in this paragraph.

10    76.    This cause of action is brought under RICO Section 1962(c). RICO Section

11    1962(c) prohibits a person from managing or operating an enterprise through a pattern of

12    racketeering activity (such as mail fraud, wire fraud, bank fraud, interstate transportation of stolen

13    property, etc.).

14    77.    Mutual Vision is an "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

15    Mutual Vision was engaged in interstate commerce and its activities affected interstate commerce

16    at all relevant times.

17    78.    Robert Estupinian and Ginny Estupinian are "persons" as that term is defined in 18

18    U.S.C. § 1961(3) and were members of, employed by, and/or associated with Mutual Vision at all

19    relevant times. As its members and officers, Robert and Ginny Estupinian operate or manage

20    Mutual Vision.

21    79.    Over the course of several years, from 2004 through 2007, Robert and Ginny

22    Estupinian agreed to and did conduct and participate, directly or indirectly, in the conduct of

23    Mutual Vision's affairs through a continuous pattern of racketeering activity. That pattern of

24    racketeering activity included wire fraud, bank fraud, and transportation of stolen property in

25    interstate commerce. Through that pattern of racketeering activity, Robert Estupinian and Ginny

26    Estupinian executed and covered up a scheme to defraud Vesta Strategies. The affairs of Mutual

27    Vision, as conducted and participated in by Robert and Ginny Estupinian, constitute a "pattern of

28    racketeering activity" as that phrase is used in 18 U.S.C. § 1962(c).

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1   80.   In furtherance of their scheme and artifice to defraud, Mutual Vision, Robert

2   Estupinian, and Ginny Estupinian transported (or caused to be transported) in interstate commerce

3   property that they knew was stolen or obtained by fraud. Specifically, the Vesta Strategies funds

4   that Robert and Ginny Estupinian (through Mutual Vision) stole or fraudulently obtained were

5   sent across state lines from one bank to another. For example:

6   •   On September 13, 2005, in three separate transactions. Robert and Ginny
        Estupinian used over $700,000 of money that was stolen or fraudulently obtained
7       from Vesta Strategies to purchase three lots in South Carolina. The place of
        settlement for those purchases was in Bluffton, South Carolina, but the money
8       used for the purchase came from California.

9   •   On August 7, 2006 and August 21, 2006, $27,760 and $22,458 (respectively) of
        money that was stolen or fraudulently obtained from Vesta Strategies was wired
10      from Mutual Vision's account at the San Jose National Bank in San Jose,
        California to Wachovia Bank of South Carolina in Aiken, South Carolina.
11

12   The transportation of stolen or fraudulently obtained funds in interstate commerce constitutes

13   predicate acts pursuant to 18 U.S.C. § 2314.

14   81.   In furtherance of their scheme and artifice to defraud, Mutual Vision, Robert

15   Estupinian, and Ginny Estupinian electronically wired money across state lines (including but not

16   limited to the wires listed in the preceding paragraph). In addition, the Estupinians caused e-

17   mails to be sent from California to Illinois in order to further and cover up their scheme to

18   defraud, including a June 7, 2004 e-mail to the office of the manager and majority member falsely

19   stating where the $1,256,150 that the Estupinians used to buy their house was being transferred

20   to. These wires constitute predicate acts of wire fraud pursuant to 18 U.S.C. § 1343.

21   82.   In furtherance of their scheme and artifice to defraud, Mutual Vision, Robert

22   Estupinian, and Ginny Estupinian have also engaged in bank fraud. Specifically, Robert and

23   Ginny Estupinian used Mutual Vision's minority membership in Vesta Strategies and Robert

24   Estupinian's resulting position as CEO of Vesta Strategies to pay Tognazzini a salary from Vesta

25   Strategies even though she did not perform any work for Vesta Strategies. The purpose of paying

26   Tognazzini this unearned salary for a one year period of time was, upon information and belief,

27   so that Tognazzini could claim to be employed and to have an income when she applied for

28   mortgage loans. In addition, as alleged above, Robert and Ginny Estupinian used Mutual Vision

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

AMENDED COMPLAINT                    - 15 -                    CASE NO. C 07-06216 JW RS

1   to obtain Vesta Strategies' moneys and funds through false and fraudulent pretenses or

2   representations.  Vesta Strategies' moneys and funds were under the custody or control of a

3   financial institution at the time that they were wrongfully obtained.  These acts of bank fraud

4   constitute predicate acts pursuant to 18 U.S.C. § 1344.

5       83.     Robert and Ginny Estupinian's violations of 18 U.S.C. § 1962 have directly and

6   proximately caused Vesta Strategies damages in its business and property.

7       WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

8   Count I in its favor and against Robert Estupinian and Ginny Estupinian, and award Vesta

9   Strategies the following relief:

    (1)   money damages in the amount proximately caused by Robert Estupinian
          and Ginny Estupinian's RICO violations;

    (2)   treble damages pursuant to 18 U.S.C. § 1964(c);

    (3)   reasonable attorneys' fees and costs; and

    (4)   such further or different relief as this Court deems appropriate.

### COUNT II – RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d)
### Against Robert Estupinian, Ginny Estupinian,
### Mutual Vision, Millennium, Tognazzini, Vesta Reverse, and Vesta Capital

17      84.     Vesta Strategies incorporates the allegations of paragraphs 1 through 83 above as

18  if fully set forth in this paragraph.

19      85.     This cause of action is brought under RICO Section 1962(d).  A RICO Section

20  1962(c) claim is broad, but a RICO conspiracy claim under Section 1962(d) is even broader.

21  Anyone who agrees or conspires to pursue the same criminal objective can be held liable for a

22  RICO violation under Section 1962(d).

23      86.     At least Robert Estupinian, Ginny Estupinian, Mutual Vision, Millennium,

24  Tognazzini, Vesta Reverse, and Vesta Capital agreed and conspired to violate 18 U.S.C. §

25  1962(c).  In addition, Vesta Strategies continues to investigate whether other individuals

26  participated in the RICO conspiracy.

27      87.     Each of the conspirators agreed to conduct and participate in, or to knowingly

28  facilitate operation or management of, Mutual Vision's affairs as part of a scheme or artifice to

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1  defraud Vesta Strategies. Each of the conspirators knew that the predicate acts described above

2  would be used in furtherance of their scheme or artifice to defraud.

3      88.    The conspirators' violations of 18 U.S.C. § 1962(d) have directly and proximately

4  caused Vesta Strategies damages in its business and property.

5      WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

6  Count II in its favor and against Robert Estupinian, Ginny Estupinian, Mutual Vision,

7  Millennium, Tognazzini, Vesta Reverse, and Vesta Capital, and award Vesta Strategies the

8  following relief:

9          (1)    money damages in the amount proximately caused by the RICO

10                 conspirators;

11         (2)    treble damages pursuant to 18 U.S.C. § 1964(c);

12         (3)    reasonable attorneys' fees and costs; and

13         (4)    such further or different relief as this Court deems appropriate.

14                              **COUNT III – INJUNCTIVE RELIEF**
                  **Against Robert Estupinian, Ginny Estupinian, and Mutual Vision**
15

16     89.    Vesta Strategies incorporates the allegations of paragraphs 1 through 88 above as

17  if fully set forth in this paragraph.

18     90.    Vesta Strategies has suffered and will continue to suffer irreparable injury as a

19  result of Defendants' wrongful conduct, unless the Defendants are enjoined and the assets of at

20  least Robert Estupinian, Ginny Estupinian, and Mutual Vision are frozen pending final resolution

21  of this matter. That irreparable harm is continuing.

22     91.    Vesta Strategies does not have an adequate remedy at law for Defendants'

23  wrongful conduct.

24     92.    Vesta Strategies has a clear legal right to relief and a substantial likelihood of

25  success on the merits because the Defendants have repeatedly and blatantly violated their

26  fiduciary and other legal duties to Vesta Strategies.

27     93.    The significant and irreparable harm to Vesta Strategies should an injunction not

28  issue outweighs any possible harm to the Defendants should an injunction be issued.

McDermott Will & Emery LLP
ATTORNEYS AT LAW
PALO ALTO

1    94.   The granting of the injunctive relief sought by Vesta Strategies will serve, not

2    disserve, the public interest.

3    WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

4    Count III in its favor and against Robert Estupinian, Ginny Estupinian, and Mutual Vision, and

5    award Vesta Strategies the following relief:

6    (1)    Enter a preliminary and permanent injunction freezing the assets of Robert

7    Estupinian, Ginny Estupinian, and Mutual Vision;

8    (2)    reasonable attorneys' fees and costs; and

9    (3)    such further or different relief as this Court deems appropriate.

10   ## COUNT IV – CONVERSION
     **Against Robert Estupinian, Ginny Estupinian,**
11   **Mutual Vision, Millennium, Vesta Reverse, and Vesta Capital**

12   95.   Vesta Strategies incorporates the allegations of paragraphs 1 through 94 above as

13   if fully set forth in this paragraph.

14   96.   As alleged above, Robert Estupinian, Ginny Estupinian, Mutual Vision,

15   Millennium, Vesta Reverse, and Vesta Capital misappropriated substantial monies from Vesta

16   Strategies.

17   97.   Vesta Strategies was the rightful owner, and had the right to immediate possession,

18   of its funds.

19   98.   Robert Estupinian, Ginny Estupinian, Mutual Vision, Millennium, Vesta Reverse,

20   and Vesta Capital were not authorized to misappropriate and steal Vesta Strategies funds.  By

21   taking or accepting Vesta Strategies' funds without authorization, Robert Estupinian, Ginny

22   Estupinian, Mutual Vision, Millennium, Vesta Reverse, and Vesta Capital wrongfully exercised

23   dominion or control over Vesta Strategies' personal property.

24   99.   Vesta Strategies has demanded that Robert Estupinian, Ginny Estupinian, Mutual

25   Vision, Millennium, Vesta Reverse, and Vesta Capital immediately return the converted property.

26   However, those defendants have refused to return the converted property and have not in fact

27   returned that property to Vesta Strategies.

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1   100.   The conversion of Vesta Strategies' personal property has directly and proximately

2   resulted in substantial damages to Vesta Strategies.

3   WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

4   Count IV in its favor and against Robert Estupinian, Ginny Estupinian, Mutual Vision,

5   Millennium, Vesta Reverse, and Vesta Capital and award Vesta Strategies the following relief:

6   (1)   money damages in the amount converted by Robert Estupinian, Ginny
        Estupinian, Mutual Vision, Millennium, Vesta Reverse, and Vesta Capital;

7

8   (2)   punitive damages;

9   (3)   reasonable attorneys' fees and costs; and

10  (4)   such further or different relief as this Court deems appropriate.

11  **COUNT V – BREACH OF FIDUCIARY DUTY**
    **Against Robert Estupinian, Ginny Estupinian, and Mutual Vision**

12  101.   Vesta Strategies incorporates the allegations of paragraphs 1 through 100 above as

13  if fully set forth in this paragraph.

14  102.   As the CEO of Vesta Strategies, Robert Estupinian owed fiduciary duties to Vesta

15  Strategies and its majority member.  Robert Estupinian's fiduciary duties included, but were not

16  limited to:  the duty not to exploit his position with Vesta Strategies for his own personal benefit;

17  the duty to protect Vesta Strategies' and its depositors money; the duty to use Vesta Strategies'

18  money for true Vesta Strategies business; the duty of candor with respect to what Vesta

19  Strategies' money was being spent for; a duty to provide a complete, timely, and detailed

20  accounting to Vesta Strategies of the uses and disposition of Vesta Strategies' money; and the

21  duty to otherwise deal fairly with Vesta Strategies and act in Vesta Strategies' best interests.

22  103.   As alleged above, Robert Estupinian actively exploited his fiduciary position

23  within Vesta Strategies to advance his personal interests at Vesta Strategies' direct expense.  For

24  example, Robert Estupinian breached his fiduciary duties through, among other ways, any or all

25  of the following actions:

26  A.   Using Vesta Strategies' money to finance his lavish and extravagant

27  lifestyle;

28  B.   Using Vesta Strategies' money to pay Robert and Ginny Estupinian's

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1    friends and family members money that they did not earn;

2        C.    Using Vesta Strategies' money to pay for psychological studies to aid

3        Ginny Estupinian's career;

4        D.    Using Vesta Strategies' money to pay obligations of Robert Estupinian's

5        other companies;

6        E.    Using Vesta Strategies' money to pay phony referral fees to Millennium;

7        F.    Using Vesta Strategies' money to make investments on his own behalf;

8        G.    Submitting and collecting upon expense reports for expenses incurred for

9        non-Vesta Strategies business; and

10        H.    Continuing to accept a salary from Vesta Strategies during times when he

11        was no longer acting in the best interests of Vesta Strategies.

12        104.    As an employee of Vesta Strategies, who along with her husband the CEO

13    participated in managing Vesta Strategies' affairs, Ginny Estupinian owed fiduciary duties to

14    Vesta Strategies not to take active steps to harm Vesta Strategies.

15        105.    Ginny Estupinian actively harmed Vesta Strategies. For example, Ginny

16    Estupinian breached her fiduciary duties to Vesta Strategies through, among other ways, any or

17    all of the following actions:

18        A.    Using Vesta Strategies' money to finance her lavish and extravagant

19        lifestyle;

20        B.    Accepting payroll payments that she had not earned because she was not

21        performing any significant work for Vesta Strategies; and

22        C.    Participating in her husband's numerous breaches of his fiduciary duties, as

23        alleged above.

24        106.    Robert and Ginny Estupinian's numerous breaches of their fiduciary duties has

25    directly and proximately caused millions of dollars of damages to Vesta Strategies.

26        107.    Mutual Vision has at all relevant times been the minority member of Vesta

27    Strategies. As a member, whose member was the CEO of Vesta Strategies, Mutual Vision owed

28    fiduciary duties to Vesta Strategies and its other member.

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

1    108.    Mutual Vision breached its fiduciary duties to Vesta Strategies through, among

2    other ways, wrongfully taking money out of Vesta Strategies.

3    109.    Mutual Vision's numerous breaches of its fiduciary duties has directly and

4    proximately caused millions of dollars of damages to Vesta Strategies.

5    WHEREFORE. Vesta Strategies respectfully requests that this Court enter judgment on

6    Count V in its favor and against Robert Estupinian, Ginny Estupinian, and Mutual Vision, and

7    award Vesta Strategies the following relief:

8    (1)    money damages in the amount proximately caused by Robert Estupinian,
            Ginny Estupinian, and Mutual Vision;

9

10    (2)    punitive damages;

11    (3)    reasonable attorneys' fees and costs; and

12    (4)    such further or different relief as this Court deems appropriate.

13    ### COUNT VI – FRAUD
      ### Against Robert Estupinian, Ginny Estupinian, and Mutual Vision

14    110.    Vesta Strategies incorporates the allegations of paragraphs 1 through 109 above as

15    if fully set forth in this paragraph.

16    111.    As part of their scheme to defraud Vesta Strategies, Robert Estupinian, Ginny

17    Estupinian, and Mutual Vision knowingly made, participated in the making of, or ratified false

18    and fraudulent statements of material fact and/or misleadingly failed to disclose material facts to

19    Vesta Strategies.

20    112.    Robert Estupinian, Ginny Estupinian, and Mutual Vision intended for Vesta

21    Strategies to rely on its misrepresentations and misleading omissions.  Vesta Strategies was

22    deceived by these defendants' misrepresentations and reasonably relied upon the

23    misrepresentations and fraudulent omissions. Indeed, Vesta Strategies would not have authorized

24    the improper misappropriation of its money if it had known the truth.  Nor would Vesta Strategies

25    have continued to allow Robert Estupinian to be the CEO of Vesta Strategies, Ginny Estupinian

26    to be an alleged employee of Vesta Strategies, or Mutual Vision to be Vesta Strategies' minority

27    member. Because Vesta Strategies would not have acted the way it did had it known the true

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1    facts, the misrepresentations and fraudulent omissions of Robert Estupinian, Ginny Estupinian,

2    and Mutual Vision were material.

3           113.     Vesta Strategies suffered substantial damages as a direct and proximate result of

4    its reliance on the false statements and fraudulent omissions of Robert Estupinian, Ginny

5    Estupinian, and Mutual Vision, including but not limited to, the loss of millions of dollars that

6    was obtained by these defendants and their friends and family through false pretenses.

7           114.     Robert Estupinian, Ginny Estupinian, and Mutual Vision conducted themselves in

8    an outrageous manner by engaging in grossly deceptive business practices with reckless

9    indifference to Vesta Strategies' rights.

10        WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

11    Count VI in its favor and against Robert Estupinian, Ginny Estupinian, and Mutual Vision, and

12    award Vesta Strategies the following relief:

13           (1)      money damages in the amount proximately caused by Robert Estupinian,

14                 Ginny Estupinian, and Mutual Vision;

15           (2)      punitive damages;

16           (3)      reasonable attorneys' fees and costs; and

17           (4)      such further or different relief as this Court deems appropriate.

18
### COUNT VII – CIVIL CONSPIRACY
**Against Robert Estupinian, Ginny Estupinian,**
19   **Mutual Vision, Millennium, Tognazzini, Vesta Reverse, and Vesta Capital**

20        115.     Vesta Strategies incorporates the allegations of paragraphs 1 through 114 above as

21    if fully set forth in this paragraph.

22        116.     Robert Estupinian, Ginny Estupinian, Mutual Vision, Millennium, Tognazzini,

23    Vesta Reverse, and Vesta Capital agreed to participate in a venture that would wrongfully

24    misappropriate funds from Vesta Strategies.

25        117.     Pursuant to their agreement, these defendants intentionally acted in concert to

26    breach their respective fiduciary and other legal duties to Vesta Strategies and to cause Vesta

27    Strategies injury. Robert Estupinian, Ginny Estupinian, and Mutual Vision all took affirmative

28    actions in furtherance of their agreement by, without limitation, withdrawing money from Vesta

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
PALO ALTO

1   Strategies for the benefit of Robert Estupinian, Ginny Estupinian, Mutual Vision, Millennium,

2   Tognazzini, Vesta Reverse, and Vesta Capital.

3          118.   Therefore, Robert Estupinian, Ginny Estupinian, Mutual Vision, Millennium,

4   Tognazzini, Vesta Reverse, and Vesta Capital conspired to tortiously misappropriate Vesta

5   Strategies' money and use it for their own purposes

6          119.   Accordingly, these defendants are jointly liable as conspirators for any tortious

7   conduct committed in furtherance of their conspiracy.

8          120.   The tortious conduct of these defendants, committed in furtherance of their

9   conspiracy, directly and proximately caused substantial damages to Vesta Strategies.

10         WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

11   Count VII in their favor and against Robert Estupinian, Ginny Estupinian, Mutual Vision,

12   Millennium, Tognazzini, Vesta Reverse, and Vesta Capital and award Vesta Strategies the

13   following relief:

14              (1)    money damages in the amount proximately caused by the conspirators;

15              (2)    punitive damages;

16              (3)    reasonable attorneys' fees and costs; and

17              (4)    such further or different relief as this Court deems appropriate.

18                          **COUNT VIII – CONSTRUCTIVE TRUST**
                                **Against All Defendants**
19

20         121.   Vesta Strategies incorporates the allegations of paragraphs 1 through 120 above as

21   if fully set forth in this paragraph.

22         122.   As alleged above, each of the defendants wrongfully acquired or obtained money

23   from Vesta Strategies under circumstances in which, in equity and good conscience, they should

24   not be allowed to keep. Each of the defendants still has Vesta Strategies' money and they are not

25   entitled to it.

26         123.   Vesta Strategies has a right to its money and any property purchased with its

27   money. Vesta Strategies' right to its money is superior to the right of any defendant.

28

---

1    124.   A constructive trust should be entered to convey the value of the money that each

2  defendant wrongfully received because it rightly and justly belongs to Vesta Strategies, and each

3  of the defendants only gained the use of Vesta Strategies' money through theft, abuse of fiduciary

4  duties, and fraud.

5    WHEREFORE, Vesta Strategies respectfully request that this Court enter judgment on

6  Count VIII in its favor and against all of the defendants, and award Vesta Strategies the following

7  relief:

8    (1)   impose a constructive trust on all monies held by each defendant that
          rightfully belongs to Vesta Strategies;

9

10   (2)   reasonable attorneys' fees and costs; and

11   (3)   such further or different relief as this Court deems appropriate.

12

### COUNT IX – UNJUST ENRICHMENT
### Against All Defendants

13   125.   Vesta Strategies incorporates the allegations of paragraphs 1 through 124 above as

14  if fully set forth in this paragraph.

15   126.   As alleged above, each of the defendants received a benefit from the monies taken

16  from Vesta Strategies.  Each defendant has retained that benefit and was therefore unjustly

17  enriched at the direct expense of Vesta Strategies.

18   127.   It would be unjust for each of the defendants to retain that benefit at the expense of

19  Vesta Strategies.

20    WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on

21  Count IX its favor and against all of the defendants, and award Vesta Strategies the following

22  relief:

23   (1)   money damages in the amount that each defendant was unjustly enriched at
          the expense of Vesta Strategies;

24

25   (2)   punitive damages;

26   (3)   reasonable attorneys' fees and costs; and

27   (4)   such further or different relief as this Court deems appropriate.

28

AMENDED COMPLAINT                              - 24 -                      CASE NO. C 07-06216 JW RS

## COUNT X – ACCOUNTING
### Against All Defendants

128.    Vesta Strategies incorporates the allegations of paragraphs 1 through 127 above as if fully set forth in this paragraph.

129.    As alleged above, defendants have stolen, misappropriated, and misused Vesta Strategies' money for years.  Vesta Strategies has traced much of that money to Robert Estupinian, his wife, his parents, his friends, his business associates, and his personal companies. However, due to the defendants' numerous breaches of their fiduciary and other legal duties owed to Vesta Strategies, Vesta Strategies does not have complete information as to the extent, nature, causes, and beneficiaries of the monies taken from Vesta Strategies.  Vesta Strategies is entitled to a full and complete accounting at the expense of the defendants to determine what exactly happened to Vesta Strategies' money and who exactly benefited (and in what amounts) from that theft.

WHEREFORE, Vesta Strategies respectfully requests that this Court enter judgment on Count X in its favor and against all of the defendants, and award Vesta Strategies the following relief:

(1)    money damages in an amount to make Vesta Strategies whole;;

(2)    a full and complete accounting at the defendants' expense;

(3)    reasonable attorneys' fees and costs; and

(4)    such further or different relief as this Court deems appropriate.

Dated: December 10, 2007                    Respectfully submitted,

McDERMOTT WILL & EMERY LLP
DANIEL E. ALBERTI

By:_____/s/ Daniel E. Alberti_____
Daniel E. Alberti

Attorneys for Plaintiff
VESTA STRATEGIES, LLC

McDermott Will & Emery LLP
Attorneys At Law
Palo Alto

# EXHIBIT B

# EXHIBIT B

1   **Kevin R. Martin, SBN 176853**
    kmartin@randicklaw.com
2   **Brian M. O'Dea, SBN 45704**
    bodea@randicklaw.com
3   **Patrick E. Guevara SBN 202727**
    pguevara@randicklaw.com
4   **RANDICK O'DEA & TOOLIATOS, LLP**
    5000 Hopyard Road, Suite 400
5   Pleasanton, California   94588
    Telephone      (925) 460-3700
6   Facsimile      (925) 460-0969

7   Attorneys for Defendants EDMUNDO ESTUPINIAN
    and HAYDEE ESTUPINIAN, Defendants and Third Party
8   Claimants, ROBERT E. ESTUPINIAN, GINNY ESTUPINIAN,
    and Defendant, Counter Claimant and Third Party Claimant MUTUAL VISION, LLC

9

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                         SAN JOSE DIVISION

13   VESTA STRATEGIES, LLC,              | Case No.: C 07-06216 JW RS

14                    Plaintiff,          | **COUNTERCLAIM AGAINST VESTA**
                                          | **STRATEGIES, LLC**
15          vs.                           | **AND**
                                          | **THIRD PARTY CLAIM AGAINST JOHN**
16   ROBERT E. ESTUPINIAN, GINNY         | **TERZAKIS, SINGLE SITE SOLUTIONS,**
     ESTUPINIAN, MUTUAL VISION, LLC,     | **B&B SPARCO, AND PETER YE**
17   MILLENNIUM REALTY GROUP, VESTA      |
     REVERSE 100, LLC, VESTA CAPITAL     | **DEMAND FOR JURY**
18   ADVISORS, LLC, CAROL-ANN            |
     TOGNAZZINI, EDMUNDO ESTUPINIAN,     |
19   and HAYDEE ESTUPINIAN,              |

20                    Defendants.

21   MUTUAL VISION, LLC,

22                    Counter Claimant,

23          vs.

24   VESTA STRATEGIES, LLC,

25                    Counter Defendant.

26   MUTUAL VISION, LLC, ROBERT
     ESTUPINIAN AND GINNY ESTUPINIAN,

27                    Third Party Claimants,

28                                                                    1

1    vs.

2

3    JOHN TERZAKIS, SINGLE SITE
     SOLUTIONS CORPORATION, B&B
4    SPARCO PROPERTIES, INC., AND
     PETER YE,
5
                Third Party Defendants.
6

7

8         Counter Claimant Mutual Vision, LLC and Third Party Claimants Mutual Vision, LLC,

9    Robert Estupinian, and Ginny Estupinian (collectively "Mutual Vision") allege the following:

10                              **NATURE OF ACTION**

11        1.       This case arises out of the soured relationship between John D. Terzakis

12   ("Terzakis") and Robert Estupinian ("Estupinian") in connection with Terzakis' continued

13   mismanagement of and embezzlement from their joint business operation Vesta Strategies, LLC

14   ( "Vesta Strategies"). Vesta Strategies is a qualified intermediary for Section 1031 tax-deferred

15   real estate exchanges and has at any one time control of ten to thirty million dollars in client

16   deposits. Vesta Strategies is the latest incarnation of the business model first put together by

17   Terzakis and Estupinian back in 2000 under the name Investment Advantage Group, LLC. At

18   various times since then, Robert Estupinian has had to reinvent the business to overcome

19   negative publicity and lawsuits spawned by Terzakis' mismanagement, manipulation and

20   conversion of client assets and embezzlement of client funds. John Terzakis' wrongful and

21   unlawful conduct includes, but is not limited to:

22        •       Converting Vesta Strategies' client funds for private use and investments for

23                himself, his family, and his businesses Single Site Solutions and B&B Sparco Properties,

24                Inc.;

25        •       Converting Vesta Strategies' client funds without their knowledge or consent and

26                failing to return them on demand causing Vesta Strategies, LLC millions in interest and

27                penalties;

28                                                                                        2

     COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
     TERZAKIS, SINGLE SITE SOLUTIONS,  B&B SPARCO, AND PETER YE    DEMAND FOR JURY
     CASE NO.: C 07-06216 JW RS         \\FSPROLAW\PROLAWDOCS\E0302.0011\161724.DOC

1    •    Stealing Vesta Strategies' money for his own personal use;

2    •    Deliberately and continuously refusing to provide Mutual Visions, LLC (a 49%

3    owner and partner in the business) any accounting or tax returns for Vesta Strategies',

4    IAG 1031 LLC, or Investment Advantage Group, LLC, in order to secret the profits of

5    the company for his private use and investment, and that of his family, and his businesses

6    Single Site Solutions, and B&B Sparco Properties, Inc.;

7    •    Converting Vesta Strategies' monies to pay for obligations of his other companies

8    and personal liabilities; and

9    •    Deliberately and with fraudulent intent approving Vesta Strategies' expenses from

10    third party vendors but then refusing to pay for them.

11    2.    Mutual Vision brings this action against Terzakis, his company Single Site

12    Solutions, B& B Sparco Properties, Inc., and his principal co-conspirator in these activities, Peter

13    Ye, seeking recovery of the converted Vesta Strategies monies, damages, and a full accounting

14    from Vesta Strategies and those other defendants in receipt of unlawful monies.

15                                         **PARTIES**

16    3.    Counterclaimant and Third-Party Plaintiff Mutual Vision, LLC is a California

17    limited liability company and 49% owner/member of Plaintiff Vesta Strategies, LLC.

18    4.    Third Party Plaintiff Robert Estupinian is an owner/member of Mutual Vision,

19    LLC and former CEO of Vesta Strategies.

20    5.    Third Party Plaintiff Ginny Estupinian is an owner/member of Mutual Vision,

21    LLC and former President of Vesta Strategies.

22    6.    Counter defendant Vesta Strategies, LLC is a California limited liability

23    company. Its offices are located at 150 Almaden Boulevard, Suite 135, San Jose, California.

24    7.    Third-Party defendant John Terzakis is a 51% owner/member and manager of

25    Vesta Strategies. Upon information and belief, Terzakis is also CEO and principal owner of

26    Third-Party defendant Single Site Solutions Corporation and resides in Illinois.

27    8.    Upon information and belief, Third-Party defendant Single Site Solutions

28                                                                                3

1  Corporation is an Illinois corporation in good standing, with its principal place of business at

2  7450 Quincy Street, Willowbrook, Illinois. According to its website at www.singlesitecorp.com,

3  Single Site Solutions is a real estate development and investment firm. Upon information and

4  belief Single Site Solutions handles all the formal accounting for Terzakis' business interests,

5  including Vesta Strategies, LLC

6      9.      Upon information and belief, Third-Party defendant B&B Sparco Properties, Inc.,

7  ("B&B Sparco") is an Illinois corporation in good standing, with its principal place of business at

8  7450 Quincy Street, Willowbrook, Illinois.

9      9.      Third-Party defendant Peter Ye is the Vice-president of Operations with Vesta

10  Strategies and upon information and belief resides in San Jose, California.

11     10.     Mutual Vision alleges throughout this complaint that various members of John

12  Terzakis' family have participated in or are in receipt of Vesta Strategies' client funds and Vesta

13  Strategies' profits. Mutual Vision does not know the true names or capacities, whether

14  individual, corporate, associate or otherwise, of these defendants and therefore will seek leave to

15  amend this pleading to show the true names or capacities when the same has finally been

16  determined. Mutual Vision is informed and believes, and on such information and belief alleges,

17  that each of the defendants, is responsible in contract, or tort, or equity, or by statute for the

18  events and happenings herein referred to and proximately caused injuries or damages thereby,

19  and each of them as is hereinafter alleged.

20                          **JURISDICTION AND VENUE**

21     11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

22  Federal Rules of Civil Procedure 13(a), 13(b), 14 and 23.1. The Court has supplemental

23  jurisdiction over this matter pursuant to 28 U.S.C. § 1367 in that said counterclaims are

24  transactionally related to the main claims and therefore are permissive under the joinder

25  provisions of Federal Rule of Civil Procedure 13(h).

26     12.     Venue is proper pursuant to 28 U.S.C. § 1391(a) in that a substantial portion of

27  the events giving rise to this action occurred in San Jose, Santa Clara County, California.

28                                                                          4

COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS, B&B SPARCO, AND PETER YE    DEMAND FOR JURY
CASE NO.: C 07-06216 JW RS         \\FSPROLAW\PROLAWDOCS\E0302.001\161724.DOC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY DEMAND**

13. Mutual Vision demands a trial by jury.

**GENERAL ALLEGATIONS**

14. John Terzakis and Robert Estupinian first began working together in March 2000 in a company called Investment Advantage Group LLC. After the demise of Investment Advantage Group as a result of Terzakis' actions, the two subsequently formed IAG 1031, and most recently Vesta Strategies, LLC. All three businesses operated as qualified intermediaries for Section 1031 tax-deferred real estate exchanges. As qualified intermediaries, these companies collect deposits from clients who have sold property and are looking for subsequent investment property in order to avoid realizing capital gains on the sale and in order to recapture depreciation values. The qualified intermediary holds the deposit, and at the appropriate time, has an obligation to pay those funds out to the customer.

15. The funds held by the exchange company are not trust funds and there is no fiduciary duty owed to the taxpayer. The major reason is that the qualified intermediary has to be a disinterested third party and the taxpayer can not have constructive receipt of the funds or the exchange will fail. The person or company that is operating in the capacity of a qualified intermediary can not be an agent of the taxpayer.

16. Beginning as far back as 2000, John Terzakis has been treating the client funds as his own personal piggy bank in order to fund his many personal business and development projects. In addition to using IAG, IAG 1031 LLC, and now Vesta Strategies client funds for his own purposes, Terzakis would fund his family and Single Site Solutions real estate development deals, and B&B Sparco with client monies as well. Terzakis preferred the exchange company client funds rather than borrowing money through normal banking avenues because of the ease of access, lack of security, and the fact that he controlled the company in part and could avoid paying fees or interests. The first funds were memorialized by notes between Terzakis and Investment Advantage Group LLC and were ostensibly lent at an interest rate of 12% for one year term when the funds were supposed to be returned. The first funds were backed by second

5

1    mortgage positions in the development projects that Terzakis and his various companies were

2    involved in. As a major condition for the loans, Terzakis was required to obtain a credit line for

3    the singular use of the exchange company in the amount of 80% outstanding in order to avoid

4    any premature call on the funds by the clients. Shortly after taking the funds, however, Terzakis

5    unilaterally lowered the interest rate and removed the security to avoid paying what was legally

6    owed to the business. The only credit line that Terzakis did obtain was completely inadequate,

7    and in further self dealing, he proceeded to run up the line for his own purposes, while charging

8    interest back to the company. Since then, Terzakis has engaged in a systematic pattern and

9    practice of "borrowing" client funds without fees, interest or security, failing or refusing to return

10   the funds or secure an appropriate credit line, and leaving Vesta Strategies to answer to its

11   clients.

12       17.    Cross-defendant Peter Ye is the Vice President of Operations for Vesta Strategies

13   and manages all money wire transfers for the company. Working together, Terzakis and Ye

14   facilitated all the wire transfer of client funds from Vesta Strategies to Terzakis' private interests.

15       18.    Since 2004, Terzakis has converted approximately $25,000,000 in funds from

16   Vesta Strategies, LLC to his personal account, his family accounts, or that of his Illinois business

17   Single Site Solutions and B&B Sparco. Due principally to the repeated efforts of former CEO

18   Robert Estupinian, Vesta Strategies has managed to recover some portion of these funds, but

19   there remains outstanding approximately $19 Million that Mr. Terzakis has control over.

20   Terzakis, his family, Single Site Solutions, nor B&B Sparco have never paid those funds back or

21   any interest or earnings from any of the monies taken. As a result of Terzakis' refusal to provide

22   any accounting for the funds or their location, Vesta Strategies' 49% owner and counterclaimant

23   in this action Mutual Vision, LLC has no information as to the whereabouts or status of the

24   outstanding funds.

25       19.    Terzakis has never paid interest on the funds taken from the business. He has

26   never provided any notes for the monies he has taken and never accounted for the funds, nor any

27   profit or loss made on the investments with the funds. In addition, Terzakis and Single Site

28                                                                                6

1  Solutions have systematically refused to provide any tax returns, profit or loss statement or other

2  means of accounting for the businesses.  Upon information and belief, it is estimated that

3  Terzakis, his family, and his Illinois business Single Site Solutions and B&B Sparco have

4  benefited from use and investment of the Vesta Strategies client funds and profits in amounts

5  exceeding $20 Million dollars over the last seven years.

6       20.    Upon information and belief, Terzakis used the profits and losses of Investment

7  Advantage Group, IAG 1031 LLC, and now Vesta Strategies to offset other business income and

8  losses.

9       21.    By repeatedly converting Vesta Strategies client funds and failing or refusing to

10  return them as required for proper disbursement to Vesta Strategies clients, Terzakis has

11  subjected Vesta Strategies, Mutual Vision, LLC and Robert and Ginny Estupinian personally to

12  continuing legal liability and exposure for damages.  As a direct result of Terzakis' unlawful

13  conduct, Vesta Strategies has been forced to pay substantial penalties and other monies in order

14  to placate disgruntled clients.  Among the various instances where Terzakis has failed and

15  refused to return client funds to Vesta Strategies include:

16       &bull;    In October 2007, Terzakis failed to return over $5.3 Million dollars to Vesta

17       Strategies joint venture partner Excalibur 1031 Group for payment to its client Hoist

18       Realty, Inc. in order for the client to complete its purchase of exchange property.

19       Terzakis had been warned three weeks in advance that the funds needed to be returned

20       and had assured Estupinian and Excalibur 1031 that they would be available. At the last

21       minute, Terzakis used the funds for his own purposes, and as a direct result of these

22       actions, Vesta Strategies was forced to pay a $2,000,000 penalty to Hoist Realty, and an

23       additional $100,000 penalty to the seller of the replacement property Hoist was prepared

24       to purchase;

25       &bull;    In October 2007, Terzakis caused another $1,200,000 redemption issue with Mr.

26       Phillips which has left Vesta Strategies and Excalibur 1031 Group exposed to liability;

27       &bull;    In November 2007, Terzakis failed to return over $1.1 Million dollars to several

28        7

COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS,  B&B SPARCO, AND PETER YE    DEMAND FOR JURY
CASE NO.:  C 07-06216 JW RS    \:\FSPROLAW\PROLAWDOCS\E0302 001\151724.DOC

1    Vesta Strategies' clients located in Southern California. As a direct result of these

2    actions, Vesta Strategies lost several key relationships in that market that had taken years

3    to develop and the profitable business they had provided;

4    •    In June 2006, Terzakis borrowed $3 Million dollars from Vesta Strategies with a

5    promise to pay it back within 14 days. Terzakis had apparently made a gamble on a large

6    real estate project and relied on additional partners to complete the deal. When those

7    partners pulled out, Terzakis stood to lose his investment and converted Vesta client

8    funds to complete the deal. Terzakis did not pay the funds back for over six months, and

9    then only when the company was suffering redemptions which ultimately cost the

10    company more penalties and the loss of a top producing salesperson in Austin, Texas as

11    well as that business referral; and

12    •    In January 2005, C&R Realty of Richmond Inc. sued Vesta Strategies LLC in

13    Santa Clara County after Terzakis refused to return $3 Million in client funds. This suit

14    occurred as Vesta Strategies was beginning an aggressive public relations campaign. The

15    suit forced the cancellation of the campaign, the loss of another top producer, and

16    additional damages in penalties, interest payments, and legal fees.

17    22.    In addition to converting Vesta Strategies client funds for his own uses, Terzakis

18    used Vesta Strategies funds to pay third party debt in the amount of $349,000 in settlement of a

19    prior redemption claim against IAG from Portola Investments where again the initial funds were

20    not returned. Terzakis promised Vesta Strategies' CEO Robert Estupinian that the funds would

21    be paid back into Vesta Strategies but they never were and remain owing. Terzakis would make

22    a habit of taking luxurious vacations to Mexico and Europe during the times that clients were

23    demanding their funds back, leaving Vesta Strategies' CEO Robert Estupinian and his staff to

24    deal with the problem.

25    23.    As a result of Terzakis' continued abuse and conversion of Vesta Strategies client

26    monies, Vesta Strategies has suffered loss of business and reputation in the 1031 Exchange

27    marketplace. In April 2004, the Federation of Exchange Accommodators would not allow Vesta

28                                                                                      8

1  Strategies LLC to become a member due to the fact that John Terzakis was an owner. Mr. Ralph

2  Bunje, board member of the Federation of Exchange Accommodators, stated that Terzakis is of

3  questionable character and there are rumors of redemption problems.  Vesta Strategies lost its

4  membership in the Federation of Exchange and the bond they sponsored. The only bond that

5  Vesta Strategies was able to obtain thereafter cost five times more than that available through the

6  Federal Exchange of Accommodators.  This conduct has driven down the value of the business

7  and consequently negatively impacted Mutual Vision, LLC's stake.

8         24.     As acting manager of Vesta Strategies, Terzakis would routinely authorize the

9  company to engage third party vendors and take receipt of products and services necessary to run

10  the business, only to later refuse payment of the vendor invoices.

11        25.     In November 2007, in effort to stop Terzakis from further raiding the company

12  and converting client funds, then CEO Robert Estupinian instructed Vice President of Operations

13  Peter Ye not to facilitate any further wire transfer of funds from Vesta Strategies to Terzakis as

14  requested. Peter Ye ignored theses instructions, and proceeded to and continues to wire

15  significant funds to Terzakis to the detriment of Vesta Strategies and its clients.

16        26.     In response to Estupinian's effort to reign in Terzakis,  Terzakis concocted untrue

17  allegations against Estupinian and his wife Ginny claiming they have been embezzling money

18  through their business Vesta Capital Advisors.  In further effort to malign and slander Robert and

19  Ginny Estupinian, Terzakis proceeded to pass the complaint from the instant matter among

20  employees at Vesta Strategies.  Peter Ye proceeded to slander Robert Estupinian in the business

21  community by telling associates of Robert Estupinian that "without a doubt Robert stole $6

22  million and is going to prison" knowing full well that these claims are untrue.

23        27.     To the extent necessary, Mutual Vision brings this action as a derivative suit on

24  behalf of Vesta Strategies, LLC.  Making demand for suit against Terzakis and other cross-

25  defendants by Vesta Strategies, LLC would be futile since Terzakis is the majority member and a

26  manager holding 51% interest of the company and has participated in and approved the

27  wrongdoing alleged herein, and is financially interested in the challenged transactions.

28                                                                                          9

COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS, B&B SPARCO, AND PETER YE    DEMAND FOR JURY
CASE NO.: C 07-06216 JW RS         \FSPROLAW.PROLAWDOCS\E0302 001\161724.DOC

1        **FIRST CLAIM FOR RELIEF-CONVERSION**

2            **Against All Third Party Defendants**

3        28.    Mutual Vision re-alleges and incorporates by reference as through fully set forth

4    herein, paragraphs 1 through 27, inclusive, of this pleading.

5        29.    As alleged above, Terzakis, working in concert with members of his family, Peter

6    Ye, and his business Single Site Solutions and B&B Sparco, have misappropriated substantial

7    monies from Vesta Strategies, and, by virtue of its 49% ownership interest thereof, Mutual

8    Vision.

9        30.    Vesta Strategies, and, by virtue of its 49% ownership interest thereof, Mutual

10   Vision, was the rightful owner and had right to immediate possession of these funds.

11       31.    Terzakis, his family members, Ye, Single Site Solutions, and B&B Sparco were

12   not authorized to misappropriate and steal Vesta Strategies, and, by virtue of its 49% ownership

13   interest thereof, Mutual Vision, funds.  In doing the acts as alleged above, Terzakis, his family

14   members, Ye, Single Site Solutions, and B&B Sparco wrongfully exercised dominion and

15   control over these funds.

16       32.    Mutual Vision has demanded that these funds be returned, and that an accounting

17   be provided, but defendants have refused to return the converted property.

18       WHEREFORE, Mutual Vision prays for relief as follows:

19       (a)    Money damages in the amount converted by Terzakis, Ye, and Single Site

20              Solutions, B&B Sparco and any other defendant;

21       (b)    Punitive damages;

22       (c)    Reasonable attorney's fees and costs; and

23       (d)    Any further relief as this Court deems appropriate.

24

25            **SECOND CLAIM FOR RELIEF-**

26   **BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY**

27            **Against Terzakis and Ye**

28                                                                                    10

---
COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS, B&B SPARCO, AND PETER YE    DEMAND FOR JURY
CASE NO.: C 07-06216 JW RS        \\FSPROLAW\PROLAWDOCS\E0302 00\116:724 DOC

1       33.    Mutual Vision re-alleges and incorporates by reference as through fully set forth

2   herein, paragraphs 1 through 32, inclusive, of this pleading.

3       34.    As the managing member of Vesta Strategies, John Terzakis owed a fiduciary

4   duty and duty of loyalty to Vesta Strategies, and its other member owner Mutual Vision, LLC.

5   Terzakis' duties included, but were not limited to:  the duty not to exploit his position with Vesta

6   Strategies for his own personal benefit; the duty to protect Vesta Strategies' and its clients'

7   funds; the duty to make full and truthful accounting to Vesta Strategies and Mutual Vision, LLC

8   as to the profit and loss of the company; the duty not to recklessly expose Vesta Strategies, its

9   officers, or by virtue of its 49% ownership interest Mutual Vision, LLC to lawsuits and

10  redemptions; the duty to otherwise deal fairly with Vesta Strategies and by virtue of its 49%

11  ownership interest Mutual Vision, LLC, and to act in their best interest.

12      35.    As Vice President of Operations of Vesta Strategies, Peter Ye owed a fiduciary

13  duty and duty of loyalty to Vesta Strategies, and its other member owner Mutual Vision, LLC.

14  Ye's duties included, but were not limited to:  the duty not to exploit his position with Vesta

15  Strategies for his own personal benefit; the duty to protect Vesta Strategies' and its clients'

16  funds; and the duty to otherwise deal fairly with his employer Vesta Strategies, and by virtue of

17  its 49% ownership interest Mutual Vision, LLC, and to act in their best interest.

18      36.    As alleged above Terzakis and Ye breached their respective duties to Vesta

19  Strategies, its officers, and, by virtue of its 49% ownership interest, Mutual Vision, LLC.

20      37.    Terzakis and Ye's breaches of their respective duties have directly and

21  proximately caused millions of dollars of damages to Vesta Strategies, and, by virtue of its 49%

22  ownership interest, Mutual Vision, LLC, and further damages to Vesta Strategies' former

23  officers Robert and Ginny Estupinian.

24      WHEREFORE, Mutual Vision prays for relief as follows:

25      (a)    Money damages in the amount proximately caused by Terzakis and Ye;

26      (b)    Punitive damages;

27      (c)    Reasonable attorney's fees and costs; and

28                                                          11

1   (d)   Any further relief as this Court deems appropriate.

2

3   ### THIRD CLAIM FOR RELIEF-FRAUD

4   #### Against Terzakis

5   38.   Mutual Vision re-alleges and incorporates by reference as through fully set forth

6   herein, paragraphs 1 through 37, inclusive, of this pleading.

7   39.   As part of his effort to convert funds and profit of Vesta Strategies, and, by virtue

8   of its 49% ownership interest, Mutual Vision, LLC, John Terzakis knowingly made, participated

9   in the making of, or ratified false and fraudulent statements of material fact and/or misleadingly

10   failed to disclose material facts to Vesta Strategies and its management including its CEO Robert

11   Estupinian.

12   40.   Terzakis intended for Vesta Strategies, and, by virtue of its 49% ownership

13   interest Mutual Vision, LLC, and its management to repeatedly rely on his misrepresentations

14   and misleading omissions in order to facilitate continuing transfer of Vesta Strategies client

15   funds for his personal use and investment, and that of his family, and businesses Single Site

16   Solutions and B&B Sparco. Mutual Vision would not have allowed these continued transfers

17   and acted the way it did in allowing Terzakis' continued actions, had it known the true facts and

18   consequently Terzakis' misrepresentations and omissions were material.

19   41.   Vesta Strategies, and, by virtue of its 49% ownership interest, Mutual Vision,

20   LLC, suffered substantial damages as a direct and proximate result of its reliance on the false

21   statements and fraudulent omissions of Terzakis, including, but not limited to, the loss of

22   substantial profits, interest, as well as monies lost in settlement of redemptions caused directly as

23   a result of Terzakis' actions.

24   42.   Terzakis' conduct constitutes intentional misrepresentations, deceit, and

25   concealment of material facts known to him with the intention to deprive Vesta Strategies, and,

26   by virtue of its 49% ownership interest, Mutual Vision, LLC, of property or legal rights or

27   otherwise cause it injury, and was despicable conduct that subjected Vesta Strategies and Mutual

28                                                                                    12

1  Vision to cruel and unjust hardships in conscious disregard of their rights, so as to justify an

2  award of exemplary and punitive damages.

3      WHEREFORE, Mutual Vision prays for relief as follows:

4          (a)    Money damages in the amount proximately caused by Terzakis;

5          (b)    Punitive damages;

6          (c)    Reasonable attorney's fees and costs; and

7          (d)    Any further relief as this Court deems appropriate.

8

9                  **FOURTH CLAIM FOR RELIEF-CONSTRUCTIVE TRUST**

10                        **Against All Third Party Defendants**

11      43.    Mutual Vision re-alleges and incorporates by reference as through fully set forth

12  herein, paragraphs 1 through 42, inclusive, of this pleading.

13      44.    As alleged above, Terzakis, Ye, Single Site Solutions, B&B Sparco and others

14  wrongfully acquired money from Vesta Strategies under circumstances in which, in equity and

15  good conscience, they should not be allowed to keep.

16      45.    Vesta Strategies, and, by virtue of its 49% ownership interest Mutual Vision,

17  LLC, has a right to its money, including profits from its business and interest in any property or

18  other investment purchased therewith.  These rights are superior to those of Terzakis, Ye, Single

19  Site Solutions, B&B Sparco or others who have benefited unfairly by this conduct.

20      46.    A constructive trust should be entered to convey the value of the money that each

21  defendant wrongfully received because it rightly and justly belongs to Vesta Strategies, and, by

22  virtue of its 49% ownership interest Mutual Vision, LLC., and each of the defendants only

23  gained use of the funds through theft, conversion, and abuse of fiduciary duty and fraud.

24      WHEREFORE, Mutual Vision prays for relief as follows:

25          (a)    Impose a Constructive Trust on all monies held by each defendant that rightfully

26                  belongs to Vesta Strategies;

27          (b)    Reasonable attorney's fees and costs; and

28                                                                              13

---

COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS, B&B SPARCO, AND PETER YE    DEMAND FOR JURY
CASE NO.: C 07-06216 JW RS        \\FSPROLAW\PROLAWDOCS\E0302.001\161724.DOC

1     (c)    Any further relief as this Court deems appropriate.

2

3         **FIFTH CLAIM FOR RELIEF- INTERFERENCE WITH CONTRACT**

4                            **Against Terzakis**

5     47.    Mutual Vision re-alleges and incorporates by reference as through fully set forth

6 herein, paragraphs 1 through 46, inclusive, of this pleading.

7     48.    As part of its business operations, Vesta Strategies entered into contractual

8 agreements with its clients wherein they entrusted monies to Vesta Strategies.  The contractual

9 agreements were valid and enforceable contracts.

10     49.    Terzakis and Ye knew that said agreements existed between Vesta Strategies and

11 each of its clients.

12     50.    In acting as alleged above, including converting client funds and failing and

13 refusing to return them upon demand, Mutual Vision is informed and believes and thereon

14 alleges that Terzakis and Ye committed intentional acts designed to induce a breach or disrupt

15 the contractual agreements and intended to blemish Vesta Strategies, Mutual Vision and its

16 principal Robert Estupinian and Ginny Estupinian's professional and personal reputation and to

17 induce a breach or disrupt the contractual agreements, all of these acts causing financial duress.

18     51.    The acts committed by Terzakis and Ye caused the actual disruption of the

19 contractual agreements.  As a result of this disruption, Vesta Strategies, and, by virtue of its 49%

20 ownership interest Mutual Vision, LLC., has suffered economic harm, proximately caused by the

21 acts of Terzakis and Ye.

22     WHEREFORE, Mutual Vision prays for relief as follows:

23     (a)    Money damages in the amount proximately caused by Terzakis and Ye

24     (b)    Punitive damages

25     (c)    Reasonable attorney's fees and costs

26     (d)    Any further relief as this Court deems appropriate.

27

28                                             14

# SIXTH CLAIM FOR RELIEF –LIBEL AND SLANDER

## Against Terzakis and Ye

52.    Mutual Vision re-alleges and incorporates by reference as through fully set forth herein, paragraphs 1 through 51, inclusive, of this pleading.

53.    Robert Estupinian and Ginny Estupinian, at all relevant times herein have been engaged in the lawful business and occupation of facilitating 1031 exchanges. The Estupinians have resided in the San Francisco Bay Area, in the State of California, for over 20 years and at all times have enjoyed a good reputation both generally and in their occupation.

54.    On or about November 3, 2007 and continuing forward, Third party defendant Terzakis published copies of the original complaint in this matter which alleges untruths and defamatory statements directed at Estupinian and his wife Ginny claiming they have been embezzling money through their businesses Mutual Vision, Millenium Realty Group and Vesta Capital Advisors. In further effort to malign and slander Robert and Ginny Estupinian, Terzakis proceeded to pass the complaint from the instant matter among employees at Vesta Strategies.

55.    This complaint is untrue and contains false statements. It clearly exposes the Estupinians to hatred, contempt, ridicule, and obloquy because it impugns the integrity of Robert and Ginny Estupinian.

56.    This complaint was seen and read by past and present employees at Vesta Strategies in San Jose, California and other business associates of the Estupinians.

57.    Sometime in November and December 2007, Peter Ye published defamatory statements about Robert Estupinian in the business community by telling associates of Robert Estupinian that "without a doubt Robert stole $6 million and is going to prison" knowing full well that these claims are not true.

58.    As a proximate result of the above-described publication, Robert and Ginny Estupinian have suffered loss of their reputation, shame, mortification, and hurt feelings all to their general damage.

59.    The above-described publications were published by the Terzakis and Ye with

15

1   malice, oppression, and fraud malice in that they knew the and thus plaintiff seeks an award of

2   punitive damages.

3       WHEREFORE, Mutual Vision prays for relief as follows:

4       (a)   Money damages in the amount proximately caused by Terzakis and Ye;

5       (b)   Punitive damages;

6       (c)   Reasonable attorney's fees and costs; and

7       (d)   Any further relief as this Court deems appropriate.

8

9                    **SEVENTH CLAIM FOR RELIEF – NEGLIGENCE**

10                       **Against Single Site Solutions**

11      60.   Mutual Vision re-alleges and incorporates by reference as through fully set forth

12  herein, paragraphs 1 through 59, inclusive, of this pleading.

13      61.   Single Site Solutions, and its agents, owed a duty of care to Vesta Strategies, in its

14  actions and activities as accountant and bookkeeper for Vesta Strategies, to properly record and

15  maintain profits and loss statements, income and expenses and other items of record as to Vesta

16  Strategies' business.

17      62.   Said defendants breached these duties, by failing to properly record and maintain

18  profits and loss statements, income and expenses and other items of record as to Vesta Strategies

19  business, and by failing to provide such to Mutual Vision despite repeated requests.

20      63.   As a proximate result of the foregoing conduct by defendants. Vesta Strategies

21  and, by virtue of its 49% ownership interest Mutual Vision, LLC., has been damaged in an

22  amount according to proof at trial.

23      WHEREFORE, Mutual Vision prays for relief as follows:

24      (a)   Money damages in the amount proximately caused by said negligence;

25      (b)   Reasonable attorney's fees and costs; and

26      (c)   Any further relief as this Court deems appropriate.

27

28                                                                        16

COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS, B&B SPARCO, AND PETER YE    DEMAND FOR JURY
CASE NO.: C 07-06216 JW RS        \\FSPROLAW\PROLAWDOCS\E0302.001\161724.DOC

## EIGHTH CLAIM FOR RELIEF- UNJUST ENRICHMENT

### Against All Third Party Defendants

64.     Mutual Vision re-alleges and incorporates by reference as through fully set forth herein, paragraphs 1 through 63, inclusive, of this pleading.

65.     As alleged above, each of the defendants received a benefit from the monies taken from Vesta Strategies. Each defendant has retained that benefit and therefore was unjustly enriched at the direct expense of Vesta Strategies, and, by virtue of its 49% ownership interest, Mutual Vision, LLC.

66.     It would be unjust for each of the defendants to retain that benefit at the expense of Vesta Strategies, and, by virtue of its 49% ownership interest, Mutual Vision, LLC.

WHEREFORE, Mutual Vision prays for relief as follows:

(a)     Money damages in the amount each defendant was unjustly enriched;

(b)     Punitive damages;

(c)     Reasonable attorney's fees and costs; and

(d)     Any further relief as this Court deems appropriate.

## NINTH CLAIM FOR RELIEF- ACCOUNTING

### Against Vesta Strategies, and All Third Party Defendants

67.     Mutual Vision re-alleges and incorporates by reference as through fully set forth herein, paragraphs 1 through 66, inclusive, of this pleading.

68.     As alleged above, as a result of defendants actions, including conversion of funds, breach of fiduciary duty and duty of loyalty, Terzakis, Ye, Single Site Solutions, B&B Sparco, and others unknown to Mutual Vision at this time, have been unfairly enriched at the expense of Vesta Strategies, and, by virtue of its 49% ownership interest Mutual Vision, LLC. As a result, Mutual Vision is entitled to a full and complete accounting at the expense of defendants hereto to

17

1  calculate, find, and recover these monies.

2      WHEREFORE, Mutual Vision prays for relief as follows:

3      (a)    Money damages in the amount to make Vesta Strategies whole;

4      (b)    A full and complete accounting at the expense of Terzakis, Ye, Single Site

5             Solutions, B&B Sparco and others who have been unfairly enriched;

6      (c)    Reasonable attorney's fees and costs; and

7      (d)    Any further relief as this Court deems appropriate.

8

9  Date: January 7, 2008                    RANDICK O'DEA & TOOLIATOS, LLP

10

11                                 By:  _____

12                                      Kevin R. Martin

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                                                      18

COUNTERCLAIM AGAINST VESTA STRATEGIES, LLC AND THIRD PARTY CLAIM AGAINST JOHN
TERZAKIS, SINGLE SITE SOLUTIONS, B&B SPARCO, AND PETER YE   DEMAND FOR JURY
CASE NO.: C 07-06216 JW RS          \\FSPRO.LAW\PROLAWDOCS\E0502.001\161724 DOC

# EXHIBIT C

# EXHIBIT C



**Crum&Forster**
A FAIRFAX Company
305 Madison Avenue, Morristown, NJ 07962

# COMMERCIAL CRIME POLICY

## 2005 - 2006

### POLICY # 626-030096-4 ISSUED TO:

### VESTA STRATEGIES LLC

### Crime & Financial Institutions

**Crum & Forster**
**305 Madison Avenue**
**PO Box 1973**
**Morristown, NJ 07960-1973**

**(973)490-6830**

**Crum&Forster**
A FAIRFAX Company
305 Madison Avenue, Morristown, NJ 07962

POLICY NUMBER: 626-030096-4

# COMMERCIAL CRIME POLICY DECLARATIONS

In Return For The Payment Of The Premium, And Subject To All The Terms And Conditions Of This Policy, We Agree With You To Provide The Insurance As Stated In This Policy.

UNITED STATES FIRE INSURANCE COMPANY
A DELAWARE CORPORATION
HOME OFFICE: WILMINGTON, DELAWARE
(A Capital Stock Company)

CRC Insurance Services, Inc.
105 West Adams St. 18th Floor
Chicago, IL 60603
79042

NAMED INSURED: Vesta Strategies LLC
(Also list any Employee Benefit Plan(s) included as Insureds)

MAILING ADDRESS: 150 Almaden Blvd Suite 1375, San Jose, CA 95113

POLICY PERIOD: August 19, 2005 to August 19, 2006
(12:01 A.M. at your Mailing Address shown above)

INSURING AGREEMENTS, LIMITS OF INSURANCE AND DEDUCTIBLE

| INSURING AGREEMENTS | LIMIT OF INSURANCE Per Occurrence | DEDUCTIBLE AMOUNT Per Occurrence |
|---|---|---|
| 1. Employee Theft | $2,000,000.00 | $25,000.00 |
| 2. Forgery Or Alteration | Not Covered | |
| 3. Inside The Premises – Theft Of Money And Securities | Not Covered | |
| 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property | Not Covered | |
| 5. Outside The Premises | Not Covered | |
| 6. Computer Fraud | Not Covered | |
| 7. Funds Transfer Fraud | Not Covered | |
| 8. Money Orders And Counterfeit Paper Currency | Not Covered | |

If Added by Endorsement, Insuring Agreement(s):

Not Applicable

Not Applicable

If "Not Covered" is inserted above opposite any specified Insuring Agreement, such Insuring Agreement and any other reference thereto in this policy is deleted.

ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED: Endorsements 1, 2 and 3

PREMIUM: $20,000.00

CANCELLATION OF PRIOR INSURANCE ISSUED BY US:

By acceptance of this Policy you give us notice canceling prior policy Nos. _____ ;
the cancellation to be effective at the time this Policy becomes effective.

COUNTERSIGNED September 12, 2005 BY: _____
(Date) (Authorized Representative)

# COMMERCIAL CRIME POLICY
# (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section F. Definitions.

## A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations:

### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

### 2. Forgery Or Alteration

a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

(1) Made or drawn by or drawn upon you; or

(2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

b. If you are sued for refusing to pay any instrument covered in Paragraph a. above, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to Limit of Insurance applicable to this Insuring Agreement.

### 3. Inside The Premises – Theft Of Money And Securities

a. We will pay for loss of "money" and "securities" inside the "premises" or "banking premises" resulting directly from "theft", disappearance or destruction.

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

a. We will pay for loss of or damage to "other property":

(1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

(2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

### 5. Outside The Premises

a. We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

### 6. Computer Fraud

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

**a.** To a person (other than a "messenger") outside those "premises"; or

**b.** To a place outside those "premises".

### 7. Funds Transfer Fraud

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

### 8. Money Orders And Counterfeit Paper Currency

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**a.** Money orders issued by any post office, express company or bank that are not paid upon presentation; or

**b.** "Counterfeit" paper currency that is acquired during the regular course of business.

## B. Limit Of Insurance

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

## C. Deductible

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount may be applied.

## D. Exclusions

**1.** This policy does not apply to:

### a. Acts Committed By You, Your Partners Or Your Members

Loss resulting from "theft" or any other dishonest act committed by:

**(1)** You; or

**(2)** Any of your partners or "members";

whether acting alone or in collusion with other persons.

### b. Acts Of Employees, Managers, Directors, Trustees Or Representatives

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(1)** Whether acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement A.1.

### c. Governmental Action

Loss resulting from seizure or destruction of property by order of governmental authority.

### d. Indirect Loss

Loss that is an indirect result of any act or "occurrence" covered by this policy including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

### e. Legal Expenses

Expenses related to any legal action, except when covered under Insuring Agreement A.2.

### f. Nuclear

Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

### g. War And Similar Actions

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

**2.** Insuring Agreement A.1. does not apply to:

### a. Employee Cancelled Under Prior Insurance

Loss caused by any "employee" of yours, or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

© ISO Properties, Inc., 2001

CR 00 22 07 02

b. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

c. **Trading**

Loss resulting directly or indirectly from trading, whether in your name or in a genuine or fictitious account.

d. **Warehouse Receipts**

Loss resulting from fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements A.3., A.4. and A.5. do not apply to:

a. **Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

b. **Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

c. **Fire**

Loss resulting from fire, however caused, except:

(1) Loss of or damage to "money" and "securities"; and

(2) Loss from damage to a safe or vault.

d. **Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

e. **Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

f. **Transfer Or Surrender Of Property**

(1) Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

(a) On the basis of unauthorized instructions;

(b) As a result of a threat to do bodily harm to any person; or

(c) As a result of a threat to do damage to any property.

(2) But, this Exclusion does not apply under Insuring Agreement A.5. to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

(a) Had no knowledge of any threat at the time the conveyance began; or

(b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

g. **Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

h. **Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement A.6. does not apply to:

a. **Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

b. **Funds Transfer Fraud**

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

c. **Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

(1) An inventory computation; or

(2) A profit and loss computation.

© ISO Properties, Inc., 2001

### d. Voluntary Parting Of Title To Or Possession Of Property

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

### 5. Insuring Agreement A.7. does not apply to:

**Computer Fraud**

Loss resulting from the use of any computer to fraudulently cause a transfer of "money", "securities" or "other property".

## E. Conditions

### 1. Conditions Applicable To All Insuring Agreements

#### a. Cancellation As To Any Employee

This policy is cancelled as to any "employee":

(1) Immediately upon discovery by:

  (a) You; or

  (b) Any of your partners, "members" "managers", officers, directors or trustees not in collusion with the "employee";

of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

#### b. Cancellation Of Policy

(1) The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

(2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

  (a) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

  (b) 30 days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

#### c. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

#### d. Concealment, Misrepresentation Or Fraud

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

(1) This policy;

(2) The property covered under this policy;

(3) Your interest in the property covered under this policy; or

(4) A claim under this policy.

#### e. Consolidation – Merger

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become "employees" or you acquire the use and control of any additional "premises":

(1) You must give us written notice and obtain our written consent to extend this insurance to such additional "employees" or "premises". We may condition our consent upon payment of an additional premium; but

© ISO Properties, Inc., 2001

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, any insurance afforded for "employees" or "premises" also applies to these additional "employees" or "premises" for acts committed or events occurring within this 90 day period.

f. **Discovery**

(1) We will pay for loss that you sustain through acts committed or events occurring at any time and discovered by you:

   (a) During the policy period shown in the Declarations; or

   (b) During the period of time provided in the Extended Period To Discover Loss Condition E.1.j.

(2) Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known.

   Discovery also occurs when you receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this policy.

g. **Duties In The Event Of Loss**

After you discover a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreements A.1. or A.2.) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Give us a detailed, sworn proof of loss within 120 days.

(4) Cooperate with us in the investigation and settlement of any claim.

h. **Employee Benefit Plan(s)**

(1) The "employee benefit plan(s)" shown in the Declarations are included as Insureds under Insuring Agreement A.1.

(2) If any "employee benefit plan(s)" is insured jointly with any other entity under this policy, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement A.1. that is sufficient to provide a limit of insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(3) With respect to losses sustained or discovered by any such Plan, Insuring Agreement A.1. is replaced by the following:

   We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(4) If the first Named Insured is an entity other than a Plan, any payment we make to that Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.

(5) If two or more Plans are insured under this policy, any payment we make for loss:

   (a) Sustained by two or more Plans; or

   (b) Of commingled "funds" or "other property" of two or more Plans;

   that arises out of one "occurrence", is to be shared by each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total of those limits.

(6) The Deductible Amount applicable to Insuring Agreement A.1. does not apply to loss sustained by any "employee benefit plan(s)".

i. **Examination Of Your Books And Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to 3 years afterward.

j. **Extended Period To Discover Loss**

(1) We will pay for loss that you sustained prior to the effective date of termination or cancellation of this policy, which is discovered by you:

   (a) No later than 60 days from the date of that termination or cancellation; and

**(b)** As respects any "employee benefit plan(s)", no later than 1 year from the date of that termination or cancellation.

**(2)** However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**k. Inspections And Surveys**

**(1)** We have the right to:

**(a)** Make inspections and surveys at any time;

**(b)** Give you reports on the conditions we find; and

**(c)** Recommend changes.

**(2)** We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

**(a)** Are safe or healthful; or

**(b)** Comply with laws, regulations, codes or standards.

**(3)** Paragraphs **(1)** and **(2)** above apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**l. Joint Insured**

**(1)** If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this policy. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

**(2)** If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this policy, that knowledge is considered knowledge of every Insured.

**(3)** An "employee" of any Insured is considered to be an "employee" of every Insured.

**(4)** If this policy or any of its coverages is cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered by you during the period of time provided in the Extended Period To Discover Loss Condition **E.1.j.**

However, this extended period to discover loss terminates as to that Insured immediately upon the effective date of any other insurance obtained by that Insured replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

**(5)** We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

**m. Legal Action Against Us**

You may not bring any legal action against us involving loss:

**(1)** Unless you have complied with all the terms of this policy;

**(2)** Until 90 days after you have filed proof of loss with us; and

**(3)** Unless brought within 2 years from the date you discover the loss.

If any limitation is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**n. Liberalization**

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

**o. Loss Covered Under More Than One Coverage Of This Policy**

If two or more coverages of this policy apply to the same loss, we will pay the lesser of:

**(1)** The actual amount of loss; or

**(2)** The sum of the Limits of Insurance applicable to those coverages.

© ISO Properties, Inc., 2001
CR 00 22 07 02

p. **Non-Cumulation Of Limit Of Insurance**

Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or policy period to policy period.

q. **Other Insurance**

This policy does not apply to loss recoverable or recovered under other insurance or indemnity. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity.

However, this policy will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the Declarations.

r. **Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease;

(2) That you hold for others; or

(3) For which you are legally liable, except for property inside the premises of a "client" of yours.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

s. **Premiums**

The first Named Insured shown in the Declarations:

(1) Is responsible for the payment of all premiums; and

(2) Will be the payee for any return premiums we pay.

t. **Records**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

u. **Recoveries**

(1) Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this policy will be distributed as follows:

(a) To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;

(b) Then to us, until we are reimbursed for the settlement made; and

(c) Then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

v. **Territory**

This policy covers acts committed or events occurring within the United States of America (including its territories and possessions), Puerto Rico and Canada.

w. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

x. **Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

y. **Valuation — Settlement**

(1) Subject to Section B. Limit Of Insurance, we will pay for:

(a) Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

(i) At face value in the "money" issued by that country; or

(ii) In the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(b) Loss of "securities" but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

(i) Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

i. Value of the "securities" at the close of business on the day the loss was discovered; or

ii. Limit of Insurance.

(c) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

(i) The Limit of Insurance applicable to the lost or damaged property;

(ii) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(2) We may, at our option, pay for loss of or damage to property other than "money":

(a) In the "money" of the country in which the loss occurred; or

(b) In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(3) Any property that we pay for or replace becomes our property.

2. **Condition Applicable To Insuring Agreement A.1.**

**Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition **E.1.v.** for a period of not more than 90 days.

3. **Conditions Applicable To Insuring Agreement A.2.**

a. **Deductible**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement **A.2.**

b. **Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

c. **Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. **Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition **E.1.v.** does not apply to Insuring Agreement **A.2.**

4. **Conditions Applicable To Insuring Agreements A.4. And A.5.**

a. **Armored Motor Vehicle Companies**

Under Insuring Agreement **A.5.**, we will only pay for the amount of loss you cannot recover:

(1) Under your contract with the armored motor vehicle company; and

© ISO Properties, Inc., 2001

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

b. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

5. **Conditions Applicable To Insuring Agreement A.6.**

a. **Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

b. **Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition **E.1.v.** does not apply to Insuring Agreement **A.6.**

F. **Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Client" means any entity for whom you perform services under a written agreement.

3. "Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Employee":

a. "Employee" means:

(1) Any natural person:

(a) While in your service or for 30 days after termination of service;

(b) Who you compensate directly by salary, wages or commissions; and

(c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee" as defined in Paragraph **(1)** above, who is on leave; or

(b) To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan(s)" insured under this policy; and

(b) Your director or trustee while that person is handling "funds" or "other property" of any "employee benefit plan(s)" insured under this policy;

(5) Any natural person who is a former "employee", director, partner, "member", "manager", representative or trustee retained as a consultant while performing services for you; or

(6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises".

b. "Employee" does not mean:

(1) Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

(2) Any "manager", director or trustee except while performing acts coming within the scope of the usual duties of an "employee".

6. "Employee benefit plan(s)" means any welfare or pension benefit plan shown in the Declarations that is subject to the Employee Retirement Income Security Act of 1974 (ERISA).

7. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8. "Fraudulent instruction" means:

   a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

   b. A written instruction (other than those described in Insuring Agreement **A.2.**) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

   c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

   a. As respects Insuring Agreement **A.1.**, all loss caused by, or involving, one or more "employees", whether the result of a single act or series of acts.

   b. As respects Insuring Agreement **A.2.**, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

   c. As respects all other Insuring Agreements:

      (1) An act or series of related acts involving one or more persons; or

      (2) An act or event, or a series of related acts or events not involving any person.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property excluded under this policy.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

   a. Caused or threatened to cause that person bodily harm; or

   b. Committed an obviously unlawful act witnessed by that person.

18. "Safe burglary" means the unlawful taking of:

   a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

   b. A safe or vault from inside the "premises".

19. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

20. "Theft" means the unlawful taking of "money", "securities" or "other property" to the deprivation of the Insured.

         © ISO Properties, Inc., 2001         CR 00 22 07 02

21. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

    a. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

    b. By means of written instructions (other than those described in Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

22. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

© ISO Properties, Inc., 2001

CR 00 22 07 02

**Endorsement # 1** Effective **August 19, 2005** Attached to and forming a part of Policy # **626-030096-4**
Issued to **Vesta Strategies LLC** et. al.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

Paragraphs **A.** and **B.** below apply only to the Commercial Crime Policy and Government Crime Policy.

**A.** Paragraphs **(2)** and **(3)** of the **Cancellation Of Policy** Condition are replaced by the following:

**(2) All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if we cancel for:

  **(i)** Nonpayment of premium; or

  **(ii)** Discovery of fraud by:

    **i.** Any insured or his or her representative in obtaining this policy; or

    **ii.** You or your representative in pursuing a claim under this policy.

**(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

**(3) All Policies In Effect For More Than 60 Days**

**(a)** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

  **(i)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

  **(ii)** Discovery of fraud or material misrepresentation by:

    **i.** Any insured or his or her representative in obtaining this policy; or

    **ii.** You or your representative in pursuing a claim under this policy.

  **(iii)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

  **(iv)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

  **(v)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

  **(vi)** A determination by the Commissioner of Insurance that the:

    **i.** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

    **ii.** Continuation of the policy coverage would:

      **(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

      **(ii)** Threaten our solvency.

**(vii)** A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

**(b)** We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

**(i)** 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

**(ii)** 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph (3)(a).

**B.** The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

**1.** Subject to the provisions of Paragraph **B.2.** below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

**2.** We are not required to send notice of nonrenewal in the following situations:

**a.** If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

**b.** If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **B.1.**

**c.** If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

**d.** If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

**e.** If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

**f.** If we have made a written offer to the first Named Insured, in accordance with the time frames shown in Paragraph **B.1.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

**C.** Under the Commercial Crime Policy, Government Crime Policy and Employee Theft And Forgery Policy, the following is added to the **Valuation – Settlement** Condition:

Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

© ISO Properties, Inc., 2004

CR 02 49 11 04

Endorsement # 2 Effective **August 19, 2005** Attached to and forming a part of Policy # **626-030096-4** Issued to **Vesta Strategies LLC** *et. al.*

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TAX-DEFERRED EXCHANGE ENDORSEMENT

It is agreed that:

1.  CONDITION **E.1.r.** is deleted in its entirety and replaced by the following:

    **Ownership of Property; Interests Covered**:

    The property covered under this insurance is limited to property:

    a.  That you own or hold; or

    b.  For which you are legally liable; or

    c.  Held in a financial institution account in a transaction involving you as a qualified intermediary for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031.

    However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

2.  EXCLUSION **D.1.a.** does not apply to losses involving the "funds" of a "client" while you are acting as a qualified intermediary in a tax-deferred exchange of property for such "client" intended to qualify under Internal Revenue Code 1031.

3.  Any loss paid (as well as any fees, costs or expenses incurred by us) as a result of the waiver of Exclusion **D.1.a.** pursuant to paragraph 2, above, will be subject to all rights of recovery that we may have against you and your partners or "members". You and they, collectively and severally, agree to indemnify us immediately for all such loss, fees, costs and expenses. The foregoing is in addition to any other rights we have under the law or under this policy.

4.  Any payment of loss under this policy involving a transaction intended to qualify as a tax-deferred exchange of property under Internal Revenue Code 1031 is conditioned upon your having complied with the following conditions precedent to coverage:

    a.  A written contractual agreement will be maintained between you as intermediary and each "client" stipulating the manner in which proceeds from the relinquished property will be held and subsequently released by you as intermediary for use in acquiring replacement property.

    b.  Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from your operating "funds", and each single exchange transaction shall be identified by a specific file number or similar

tracking identification so as to provide a clear paper trail for each exchange transaction or series of related exchange transactions.

c.  Countersignature will be required for the release of all "funds" or a monthly reconciliation of all accounts involving exchange transaction proceeds will be performed within two weeks of receipt of the account statement. Those reconciliations must be performed by an individual not authorized to deposit, withdraw or transfer funds from the account or be reviewed by an outside CPA.

**Endorsement # 3** Effective **August 19, 2005** Attached to and forming a part of Policy # **626-030096-4**
Issued to **Vesta Strategies LLC** et. al.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# INCLUDE RETROACTIVE DATE FOR NAMED INSURED

This endorsement modifies insurance provided under the Discovery Form version of the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**A. Schedule***

| |
|---|
| **Retroactive Date:**   August 15, 2005 |
| * Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

**B. Provisions**

Paragraph **(1)** of the **Discovery** Condition is replaced by the following:

We will only pay for loss that you sustain through acts committed or events occurring after the Retroactive Date shown in the Schedule and discovered by you:

1. During the policy period shown in the Declarations; or

2. During the period of time provided in the Extended Period To Discover Loss Condition.

# United States Fire Insurance Company
## A Delaware Corporation
### Home Office: Wilmington, DE

(A Capital Stock Company)

SIGNATURE

Nikolas Antonopoulos
President

SIGNATURE

Valerie J. Gasparik
Secretary

# EXHIBIT D

# EXHIBIT D



**Crum&Forster**
A FAIRFAX Company
*CRIME INSURANCE FOR THE 21ST CENTURY*

# COMMERCIAL CRIME POLICY

## 2006 - 2007

### POLICY # 626-030403-3 ISSUED TO:

### VESTA STRATEGIES, LLC

**Crime & Financial Institutions**

**Crum & Forster**
**305 Madison Avenue**
**PO Box 1973**
**Morristown, NJ 07960-1973**

**(973) 490-6830**

**POLICY NUMBER: 626-030403-3**



**Crum&Forster**
A FAIRFAX Company
305 Madison Avenue, Morristown, NJ 07962

# COMMERCIAL CRIME POLICY
# DECLARATIONS

In Return For The Payment Of The Premium, And Subject To All The Terms And Conditions Of This Policy, We Agree With You To Provide The Insurance As Stated In This Policy.

**UNITED STATES FIRE INSURANCE COMPANY**
**A DELAWARE CORPORATION**
**HOME OFFICE: WILMINGTON, DELAWARE**
**(A Capital Stock Company)**

CRC Insurance Services, Inc.
105 West Adams, 19th Floor
Chicago, Illinois 60603
79042

**NAMED INSURED:**   Vesta Strategies, LLC
                (Also list any Employee Benefit Plan(s) included as Insureds)
**MAILING ADDRESS:**  150 Almaden Boulevard, Suite 1375, San Jose, California 95113
**POLICY PERIOD:**  July 19, 2006          **to**  July 19, 2007
        **(12:01 A.M. at your Mailing Address shown above)**
**INSURING AGREEMENTS, LIMITS OF INSURANCE AND DEDUCTIBLE**

| INSURING AGREEMENTS | LIMIT OF INSURANCE Per Occurrence | DEDUCTIBLE AMOUNT Per Occurrence |
|---|---|---|
| 1. Employee Theft | $2,000,000.00 | $25,000.00 |
| 2. Forgery Or Alteration | Not Covered | --- |
| 3. Inside The Premises – Theft Of Money And Securities | Not Covered | --- |
| 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property | Not Covered | --- |
| 5. Outside The Premises | Not Covered | --- |
| 6. Computer Fraud | Not Covered | --- |
| 7. Funds Transfer Fraud | Not Covered | --- |
| 8. Money Orders And Counterfeit Paper Currency | Not Covered | --- |

**If Added by Endorsement, Insuring Agreement(s):**

Not Applicable

Not Applicable

If "Not Covered" is inserted above opposite any specified Insuring Agreement, such Insuring Agreement and any other reference thereto in this policy is deleted.

**ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED:** OFAC Notice; California Changes (CR 02 49 11 04); Include Retroactive Date For Named Insured (CR 20 05 03 00); and Tax-Deferred Exchange Endorsement

**PREMIUM:** $20,000.00

**CANCELLATION OF PRIOR INSURANCE ISSUED BY US:**

**By acceptance of this Policy you give us notice canceling prior policy Nos.**  626-030096-4          ;

the cancellation to be effective at the time this Policy becomes effective.

**COUNTERSIGNED**   July 19, 2006         **BY:**  _Chyl J. Ba_
                **(Date)**                    **(Authorized Representative)**

# COMMERCIAL CRIME POLICY
## (DISCOVERY FORM)

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is or is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **F.** Definitions.

### A. Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of Insurance is shown in the Declarations:

#### 1. Employee Theft

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from "theft" committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

#### 2. Forgery Or Alteration

a. We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in "money" that are:

(1) Made by or drawn upon you; or

(2) Made or drawn by one acting as your agent;

or that are purported to have been so made or drawn.

b. If you are sued for refusing to pay any instrument covered in Paragraph a. above, on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount that we will pay is in addition to Limit of Insurance applicable to this Insuring Agreement.

#### 3. Inside The Premises – Theft Of Money And Securities

a. We will pay for loss of "money" and "securities" inside the "premises" or "banking premises" resulting directly from "theft", disappearance or destruction.

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe, vault, cash register, cash box or cash drawer located inside the "premises" resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

#### 4. Inside The Premises – Robbery Or Safe Burglary Of Other Property

a. We will pay for loss of or damage to "other property":

(1) Inside the "premises" resulting directly from an actual or attempted "robbery" of a "custodian"; or

(2) Inside the "premises" in a safe or vault resulting directly from an actual or attempted "safe burglary".

b. We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "robbery" or "safe burglary" of "other property", if you are the owner of the "premises" or are liable for damage to it.

c. We will pay for loss of or damage to a locked safe or vault located inside the "premises" resulting directly from an actual or attempted "robbery" or "safe burglary".

#### 5. Outside The Premises

a. We will pay for loss of "money" and "securities" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from "theft", disappearance or destruction.

b. We will pay for loss of or damage to "other property" outside the "premises" in the care and custody of a "messenger" or an armored motor vehicle company resulting directly from an actual or attempted "robbery".

**6. Computer Fraud**

We will pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":

**a.** To a person (other than a "messenger") outside those "premises"; or

**b.** To a place outside those "premises".

**7. Funds Transfer Fraud**

We will pay for loss of "funds" resulting directly from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**8. Money Orders And Counterfeit Paper Currency**

We will pay for loss resulting directly from your having accepted in good faith, in exchange for merchandise, "money" or services:

**a.** Money orders issued by any post office, express company or bank that are not paid upon presentation; or

**b.** "Counterfeit" paper currency that is acquired during the regular course of business.

**B. Limit Of Insurance**

The most we will pay for loss in any one "occurrence" is the applicable Limit of Insurance shown in the Declarations.

**C. Deductible**

We will not pay for loss in any one "occurrence" unless the amount of loss exceeds the Deductible Amount shown in the Declarations. We will then pay the amount of loss in excess of the Deductible Amount, up to the Limit of Insurance. In the event more than one Deductible Amount could apply to the same loss, only the highest Deductible Amount may be applied.

**D. Exclusions**

**1.** This policy does not apply to:

**a. Acts Committed By You, Your Partners Or Your Members**

Loss resulting from "theft" or any other dishonest act committed by:

**(1)** You; or

**(2)** Any of your partners or "members";

whether acting alone or in collusion with other persons.

**b. Acts Of Employees, Managers, Directors, Trustees Or Representatives**

Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees or authorized representatives:

**(1)** Whether acting alone or in collusion with other persons; or

**(2)** While performing services for you or otherwise;

except when covered under Insuring Agreement **A.1.**

**c. Governmental Action**

Loss resulting from seizure or destruction of property by order of governmental authority.

**d. Indirect Loss**

Loss that is an indirect result of any act or "occurrence" covered by this policy including, but not limited to, loss resulting from:

**(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

**(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

**(3)** Payment of costs, fees or other expenses you incur in establishing either the existence or the amount of loss under this policy.

**e. Legal Expenses**

Expenses related to any legal action, except when covered under Insuring Agreement **A.2.**

**f. Nuclear**

Loss resulting from nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident.

**g. War And Similar Actions**

Loss resulting from war, whether or not declared, warlike action, insurrection, rebellion or revolution, or any related act or incident.

**2.** Insuring Agreement **A.1.** does not apply to:

**a. Employee Cancelled Under Prior Insurance**

Loss caused by any "employee" of yours, or predecessor in interest of yours, for whom similar prior insurance has been cancelled and not reinstated since the last such cancellation.

© ISO Properties, Inc., 2001

**b. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**c. Trading**

Loss resulting directly or indirectly from trading, whether in your name or in a genuine or fictitious account.

**d. Warehouse Receipts**

Loss resulting from fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

3. Insuring Agreements **A.3.**, **A.4.** and **A.5.** do not apply to:

**a. Accounting Or Arithmetical Errors Or Omissions**

Loss resulting from accounting or arithmetical errors or omissions.

**b. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**c. Fire**

Loss resulting from fire, however caused, except:

**(1)** Loss of or damage to "money" and "securities"; and

**(2)** Loss from damage to a safe or vault.

**d. Money Operated Devices**

Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**e. Motor Vehicles Or Equipment And Accessories**

Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**f. Transfer Or Surrender Of Property**

**(1)** Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

**(a)** On the basis of unauthorized instructions;

**(b)** As a result of a threat to do bodily harm to any person; or

**(c)** As a result of a threat to do damage to any property.

**(2)** But, this Exclusion does not apply under Insuring Agreement **A.5.** to loss of "money", "securities" or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

**(a)** Had no knowledge of any threat at the time the conveyance began; or

**(b)** Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

**g. Vandalism**

Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

**h. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

4. Insuring Agreement **A.6.** does not apply to:

**a. Exchanges Or Purchases**

Loss resulting from the giving or surrendering of property in any exchange or purchase.

**b. Funds Transfer Fraud**

Loss resulting from a "fraudulent instruction" directing a financial institution to transfer, pay or deliver "funds" from your "transfer account".

**c. Inventory Shortages**

Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

**(1)** An inventory computation; or

**(2)** A profit and loss computation.

**d. Voluntary Parting Of Title To Or Possession Of Property**

Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

5. Insuring Agreement A.7. does not apply to:

**Computer Fraud**

Loss resulting from the use of any computer to fraudulently cause a transfer of "money", "securities" or "other property".

**E. Conditions**

**1. Conditions Applicable To All Insuring Agreements**

**a. Cancellation As To Any Employee**

This policy is cancelled as to any "employee":

(1) Immediately upon discovery by:

  (a) You; or

  (b) Any of your partners, "members" "managers", officers, directors or trustees not in collusion with the "employee";

of "theft" or any other dishonest act committed by the "employee" whether before or after becoming employed by you.

(2) On the date specified in a notice mailed to the first Named Insured. That date will be at least 30 days after the date of mailing.

We will mail or deliver our notice to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

**b. Cancellation Of Policy**

(1) The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

(2) We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

  (a) 10 days before the effective date of cancellation if we cancel for non-payment of premium; or

  (b) 30 days before the effective date of cancellation if we cancel for any other reason.

(3) We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

(4) Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

(5) If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

(6) If notice is mailed, proof of mailing will be sufficient proof of notice.

**c. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**d. Concealment, Misrepresentation Or Fraud**

This policy is void in any case of fraud by you as it relates to this policy at any time. It is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

(1) This policy;

(2) The property covered under this policy;

(3) Your interest in the property covered under this policy; or

(4) A claim under this policy.

**e. Consolidation – Merger**

If through consolidation or merger with, or purchase or acquisition of assets or liabilities of, some other entity, any additional persons become "employees" or you acquire the use and control of any additional "premises":

(1) You must give us written notice and obtain our written consent to extend this insurance to such additional "employees" or "premises". We may condition our consent upon payment of an additional premium; but

© ISO Properties, Inc., 2001

(2) For the first 90 days after the effective date of such consolidation, merger or purchase or acquisition of assets or liabilities, any insurance afforded for "employees" or "premises" also applies to these additional "employees" or "premises" for acts committed or events occurring within this 90 day period.

### f. Discovery

(1) We will pay for loss that you sustain through acts committed or events occurring at any time and discovered by you:

   (a) During the policy period shown in the Declarations; or

   (b) During the period of time provided in the Extended Period To Discover Loss Condition **E.1.j.**

(2) Discovery of loss occurs when you first become aware of facts which would cause a reasonable person to assume that a loss covered by this policy has been or will be incurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when you receive notice of an actual or potential claim against you alleging facts that if true would constitute a covered loss under this policy.

### g. Duties In The Event Of Loss

After you discover a loss or a situation that may result in loss of or damage to "money", "securities" or "other property" you must:

(1) Notify us as soon as possible. If you have reason to believe that any loss (except for loss covered under Insuring Agreements **A.1.** or **A.2.**) involves a violation of law, you must also notify the local law enforcement authorities.

(2) Submit to examination under oath at our request and give us a signed statement of your answers.

(3) Give us a detailed, sworn proof of loss within 120 days.

(4) Cooperate with us in the investigation and settlement of any claim.

### h. Employee Benefit Plan(s)

(1) The "employee benefit plan(s)" shown in the Declarations are included as Insureds under Insuring Agreement **A.1.**

(2) If any "employee benefit plan(s)" is insured jointly with any other entity under this policy, you or the Plan Administrator must select a Limit of Insurance for Insuring Agreement **A.1.** that is sufficient to provide a limit of insurance for each Plan that is at least equal to that required if each Plan were separately insured.

(3) With respect to losses sustained or discovered by any such Plan, Insuring Agreement **A.1.** is replaced by the following:

We will pay for loss of or damage to "funds" and "other property" resulting directly from fraudulent or dishonest acts committed by an "employee", whether identified or not, acting alone or in collusion with other persons.

(4) If the first Named Insured is an entity other than a Plan, any payment we make to that Insured for loss sustained by any Plan will be held by that Insured for the use and benefit of the Plan(s) sustaining the loss.

(5) If two or more Plans are insured under this policy, any payment we make for loss:

   (a) Sustained by two or more Plans; or

   (b) Of commingled "funds" or "other property" of two or more Plans;

that arises out of one "occurrence", is to be shared by each Plan sustaining loss in the proportion that the Limit of Insurance required for each Plan bears to the total of those limits.

(6) The Deductible Amount applicable to Insuring Agreement **A.1.** does not apply to loss sustained by any "employee benefit plan(s)".

### i. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to 3 years afterward.

### j. Extended Period To Discover Loss

(1) We will pay for loss that you sustained prior to the effective date of termination or cancellation of this policy, which is discovered by you:

   (a) No later than 60 days from the date of that termination or cancellation; and

 © ISO Properties, Inc., 2001

(b) As respects any "employee benefit plan(s)", no later than 1 year from the date of that termination or cancellation.

(2) However, this extended period to discover loss terminates immediately upon the effective date of any other insurance obtained by you replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

### k. Inspections And Surveys

(1) We have the right to:

(a) Make inspections and surveys at any time;

(b) Give you reports on the conditions we find; and

(c) Recommend changes.

(2) We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

(a) Are safe or healthful; or

(b) Comply with laws, regulations, codes or standards.

(3) Paragraphs (1) and (2) above apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

### l. Joint Insured

(1) If more than one Insured is named in the Declarations, the first Named Insured will act for itself and for every other Insured for all purposes of this policy. If the first Named Insured ceases to be covered, then the next Named Insured will become the first Named Insured.

(2) If any Insured, or partner, "member" or officer of that Insured has knowledge of any information relevant to this policy, that knowledge is considered knowledge of every Insured.

(3) An "employee" of any Insured is considered to be an "employee" of every Insured.

(4) If this policy or any of its coverages is cancelled or terminated as to any Insured, loss sustained by that Insured is covered only if discovered by you during the period of time provided in the Extended Period To Discover Loss Condition E.1.j.

However, this extended period to discover loss terminates as to that Insured immediately upon the effective date of any other insurance obtained by that Insured replacing in whole or in part the insurance afforded by this policy, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

(5) We will not pay more for loss sustained by more than one Insured than the amount we would pay if all the loss had been sustained by one Insured.

### m. Legal Action Against Us

You may not bring any legal action against us involving loss:

(1) Unless you have complied with all the terms of this policy;

(2) Until 90 days after you have filed proof of loss with us; and

(3) Unless brought within 2 years from the date you discover the loss.

If any limitation is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

### n. Liberalization

If we adopt any revision that would broaden the coverage under this policy without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this policy.

### o. Loss Covered Under More Than One Coverage Of This Policy

If two or more coverages of this policy apply to the same loss, we will pay the lesser of:

(1) The actual amount of loss; or

(2) The sum of the Limits of Insurance applicable to those coverages.

© ISO Properties, Inc., 2001
CR 00 22 07 02

**p. Non-Cumulation Of Limit Of Insurance**

Regardless of the number of years this policy remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or policy period to policy period.

**q. Other Insurance**

This policy does not apply to loss recoverable or recovered under other insurance or indemnity. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this policy will apply to that part of the loss, other than that falling within any Deductible Amount, not recoverable or recovered under the other insurance or indemnity.

However, this policy will not apply to the amount of loss that is more than the applicable Limit of Insurance shown in the Declarations.

**r. Ownership Of Property; Interests Covered**

The property covered under this policy is limited to property:

(1) That you own or lease;

(2) That you hold for others; or

(3) For which you are legally liable, except for property inside the premises of a "client" of yours.

However, this policy is for your benefit only. It provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this policy must be presented by you.

**s. Premiums**

The first Named Insured shown in the Declarations:

(1) Is responsible for the payment of all premiums; and

(2) Will be the payee for any return premiums we pay.

**t. Records**

You must keep records of all property covered under this policy so we can verify the amount of any loss.

**u. Recoveries**

(1) Any recoveries, less the cost of obtaining them, made after settlement of loss covered by this policy will be distributed as follows:

(a) To you, until you are reimbursed for any loss that you sustain that exceeds the Limit of Insurance and the Deductible Amount, if any;

(b) Then to us, until we are reimbursed for the settlement made; and

(c) Then to you, until you are reimbursed for that part of the loss equal to the Deductible Amount, if any.

(2) Recoveries do not include any recovery:

(a) From insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

(b) Of original "securities" after duplicates of them have been issued.

**v. Territory**

This policy covers acts committed or events occurring within the United States of America (including its territories and possessions), Puerto Rico and Canada.

**w. Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual Named Insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

**x. Transfer Of Your Rights Of Recovery Against Others To Us**

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

**y. Valuation – Settlement**

(1) Subject to Section **B.** Limit Of Insurance, we will pay for:

(a) Loss of "money" but only up to and including its face value. We may, at our option, pay for loss of "money" issued by any country other than the United States of America:

(i) At face value in the "money" issued by that country; or

© ISO Properties, Inc., 2001

(ii) In the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(b) Loss of "securities" but only up to and including their value at the close of business on the day the loss was discovered. We may, at our option:

(i) Pay the value of such "securities" or replace them in kind, in which event you must assign to us all your rights, title and interest in and to those "securities"; or

(ii) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the "securities". However, we will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

i. Value of the "securities" at the close of business on the day the loss was discovered; or

ii. Limit of Insurance.

(c) Loss of or damage to "other property" or loss from damage to the "premises" or its exterior for the replacement cost of the property without deduction for depreciation. However, we will not pay more than the least of the following:

(i) The Limit of Insurance applicable to the lost or damaged property;

(ii) The cost to replace the lost or damaged property with property of comparable material and quality and used for the same purpose; or

(iii) The amount you actually spend that is necessary to repair or replace the lost or damaged property.

We will not pay on a replacement cost basis for any loss or damage:

(i) Until the lost or damaged property is actually repaired or replaced; and

(ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

If the lost or damaged property is not repaired or replaced, we will pay on an actual cash value basis.

(2) We may, at our option, pay for loss of or damage to property other than "money":

(a) In the "money" of the country in which the loss occurred; or

(b) In the United States of America dollar equivalent of the "money" of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was discovered.

(3) Any property that we pay for or replace becomes our property.

2. **Condition Applicable To Insuring Agreement A.1.**

**Territory**

We will pay for loss caused by any "employee" while temporarily outside the territory specified in the Territory Condition E.1.v. for a period of not more than 90 days.

3. **Conditions Applicable To Insuring Agreement A.2.**

a. **Deductible**

The Deductible Amount does not apply to legal expenses paid under Insuring Agreement A.2.

b. **Electronic And Mechanical Signatures**

We will treat signatures that are produced or reproduced electronically, mechanically or by other means the same as handwritten signatures.

c. **Proof Of Loss**

You must include with your proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. **Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition E.1.v. does not apply to Insuring Agreement A.2.

4. **Conditions Applicable To Insuring Agreements A.4. And A.5.**

a. **Armored Motor Vehicle Companies**

Under Insuring Agreement A.5., we will only pay for the amount of loss you cannot recover:

(1) Under your contract with the armored motor vehicle company; and

© ISO Properties, Inc., 2001

CR 00 22 07 02

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

**b. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to:

(1) Precious metals, precious or semi-precious stones, pearls, furs, or completed or partially completed articles made of or containing such materials that constitute the principal value of such articles; or

(2) Manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

**5. Conditions Applicable To Insuring Agreement A.6.**

**a. Special Limit Of Insurance For Specified Property**

We will only pay up to $5,000 for any one "occurrence" of loss of or damage to manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

**b. Territory**

We will cover loss you sustain anywhere in the world. The Territory Condition **E.1.v.** does not apply to Insuring Agreement **A.6.**

**F. Definitions**

1. "Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

2. "Client" means any entity for whom you perform services under a written agreement.

3. "Counterfeit" means an imitation of an actual valid original which is intended to deceive and to be taken as the original.

4. "Custodian" means you, or any of your partners or "members", or any "employee" while having care and custody of property inside the "premises", excluding any person while acting as a "watchperson" or janitor.

5. "Employee":

a. "Employee" means:

(1) Any natural person:

(a) While in your service or for 30 days after termination of service;

(b) Who you compensate directly by salary, wages or commissions; and

(c) Who you have the right to direct and control while performing services for you;

(2) Any natural person who is furnished temporarily to you:

(a) To substitute for a permanent "employee" as defined in Paragraph **(1)** above, who is on leave; or

(b) To meet seasonal or short-term work load conditions;

while that person is subject to your direction and control and performing services for you, excluding, however, any such person while having care and custody of property outside the "premises";

(3) Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in Paragraph **(2)** above;

(4) Any natural person who is:

(a) A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan(s)" insured under this policy; and

(b) Your director or trustee while that person is handling "funds" or "other property" of any "employee benefit plan(s)" insured under this policy;

(5) Any natural person who is a former "employee", director, partner, "member", "manager", representative or trustee retained as a consultant while performing services for you; or

(6) Any natural person who is a guest student or intern pursuing studies or duties, excluding, however, any such person while having care and custody of property outside the "premises".

b. "Employee" does not mean:

(1) Any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character; or

        © ISO Properties, Inc., 2001

(2) Any "manager", director or trustee except while performing acts coming within the scope of the usual duties of an "employee".

6. "Employee benefit plan(s)" means any welfare or pension benefit plan shown in the Declarations that is subject to the Employee Retirement Income Security Act of 1974 (ERISA).

7. "Forgery" means the signing of the name of another person or organization with intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

8. "Fraudulent instruction" means:

   a. An electronic, telegraphic, cable, teletype, telefacsimile or telephone instruction which purports to have been transmitted by you, but which was in fact fraudulently transmitted by someone else without your knowledge or consent;

   b. A written instruction (other than those described in Insuring Agreement **A.2.**) issued by you, which was forged or altered by someone other than you without your knowledge or consent, or which purports to have been issued by you, but was in fact fraudulently issued without your knowledge or consent; or

   c. An electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an "employee" but which was in fact fraudulently transmitted by someone else without your or the "employee's" knowledge or consent.

9. "Funds" means "money" and "securities".

10. "Manager" means a person serving in a directorial capacity for a limited liability company.

11. "Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

12. "Messenger" means you, or a relative of yours, or any of your partners or "members", or any "employee" while having care and custody of property outside the "premises".

13. "Money" means:

   a. Currency, coins and bank notes in current use and having a face value; and

   b. Travelers checks, register checks and money orders held for sale to the public.

14. "Occurrence" means:

   a. As respects Insuring Agreement **A.1.**, all loss caused by, or involving, one or more "employees", whether the result of a single act or series of acts.

   b. As respects Insuring Agreement **A.2.**, all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

   c. As respects all other Insuring Agreements:

      (1) An act or series of related acts involving one or more persons; or

      (2) An act or event, or a series of related acts or events not involving any person.

15. "Other property" means any tangible property other than "money" and "securities" that has intrinsic value but does not include any property excluded under this policy.

16. "Premises" means the interior of that portion of any building you occupy in conducting your business.

17. "Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

   a. Caused or threatened to cause that person bodily harm; or

   b. Committed an obviously unlawful act witnessed by that person.

18. "Safe burglary" means the unlawful taking of:

   a. Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

   b. A safe or vault from inside the "premises".

19. "Securities" means negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

   a. Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

   but does not include "money".

20. "Theft" means the unlawful taking of "money", "securities" or "other property" to the deprivation of the Insured.

© ISO Properties, Inc., 2001

CR 00 22 07 02

21. "Transfer account" means an account maintained by you at a financial institution from which you can initiate the transfer, payment or delivery of "funds":

   a. By means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

   b. By means of written instructions (other than those described in Insuring Agreement **A.2.**) establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

22. "Watchperson" means any person you retain specifically to have care and custody of property inside the "premises" and who has no other duties.

© ISO Properties, Inc., 2001

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© ISO Properties, Inc., 2004

**Endorsement # 1** Effective **July 19, 2006** Attached to and forming a part of Policy # **626-030403-3** issued to Vesta Strategies, LLC

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# CALIFORNIA CHANGES

This endorsement modifies insurance provided under the following:

COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME POLICY
KIDNAP/RANSOM AND EXTORTION POLICY

Paragraphs **A.** and **B.** below apply only to the Commercial Crime Policy and Government Crime Policy.

**A.** Paragraphs **(2)** and **(3)** of the **Cancellation Of Policy** Condition are replaced by the following:

**(2) All Policies In Effect For 60 Days Or Less**

If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

**(a)** 10 days before the effective date of cancellation if we cancel for:

**(i)** Nonpayment of premium; or

**(ii)** Discovery of fraud by:

**i.** Any insured or his or her representative in obtaining this policy; or

**ii.** You or your representative in pursuing a claim under this policy.

**(b)** 30 days before the effective date of cancellation if we cancel for any other reason.

**(3) All Policies In Effect For More Than 60 Days**

**(a)** If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

**(i)** Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

**(ii)** Discovery of fraud or material misrepresentation by:

**i.** Any insured or his or her representative in obtaining this policy; or

**ii.** You or your representative in pursuing a claim under this policy.

**(iii)** A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

**(iv)** Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

**(v)** Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

**(vi)** A determination by the Commissioner of Insurance that the:

**i.** Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

**ii.** Continuation of the policy coverage would:

**(i)** Place us in violation of California law or the laws of the state where we are domiciled; or

**(ii)** Threaten our solvency.

CR 02 49 11 04                    © ISO Properties, Inc., 2004                    Page 1 of 2          □

(vii) A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

(b) We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

(i) 10 days before the effective date of cancellation if we cancel for nonpayment of premium or discovery of fraud; or

(ii) 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph (3)(a).

B. The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

1. Subject to the provisions of Paragraph **B.2.** below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

   We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

2. We are not required to send notice of nonrenewal in the following situations:

   a. If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

b. If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph **B.1.**

c. If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

d. If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

e. If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

f. If we have made a written offer to the first Named Insured, in accordance with the time frames shown in Paragraph **B.1.**, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

C. Under the Commercial Crime Policy, Government Crime Policy and Employee Theft And Forgery Policy, the following is added to the **Valuation – Settlement** Condition:

Actual cash value is calculated as the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence. Actual cash value applies to valuation of covered property regardless of whether that property has sustained partial or total loss or damage.

The actual cash value of the lost or damaged property may be significantly less than its replacement cost.

 © ISO Properties, Inc., 2004 CR 02 49 11 04 ☐

**Endorsement # 2** Effective **July 19, 2006** Attached to and forming a part of Policy # **626-030403-3**
Issued to **Vesta Strategies LLC**

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# INCLUDE RETROACTIVE DATE FOR NAMED INSURED

This endorsement modifies insurance provided under the Discovery Form version of the following:

COMMERCIAL CRIME COVERAGE FORM
COMMERCIAL CRIME POLICY
EMPLOYEE THEFT AND FORGERY POLICY
GOVERNMENT CRIME COVERAGE FORM
GOVERNMENT CRIME POLICY

**A. Schedule\***

    **Retroactive Date:** July 19, 2005

    \* Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations

**B. Provisions**

Paragraph **(1)** of the **Discovery** Condition is replaced by the following:

We will only pay for loss that you sustain through acts committed or events occurring after the Retroactive Date shown in the Schedule and discovered by you:

1. During the policy period shown in the Declarations; or
2. During the period of time provided in the Extended Period To Discover Loss Condition.

 Copyright, Insurance Services Office, Inc., 1998

Endorsement # 3 Effective July 19, 2006 Attached to and forming a part of Policy # 626-030403-3
Issued to **Vesta Strategies LLC**

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## TAX-DEFERRED EXCHANGE ENDORSEMENT

It is agreed that:

1.  CONDITION **E.1.r.** is deleted in its entirety and replaced by the following:

    **Ownership of Property; Interests Covered**:

    The property covered under this insurance is limited to property:

    a.  That you own or hold; or

    b.  For which you are legally liable; or

    c.  Held in a financial institution account in a transaction involving you as a qualified intermediary for a tax-deferred exchange of property intended to qualify under Internal Revenue Code 1031.

    However, this insurance is for your benefit only. It provides no rights or benefits to any other person or organization.

2.  EXCLUSION **D.1.a.** does not apply to losses involving the "funds" of a "client" while you are acting as a qualified intermediary in a tax-deferred exchange of property for such "client" intended to qualify under Internal Revenue Code 1031.

3.  Any loss paid (as well as any fees, costs or expenses incurred by us) as a result of the waiver of Exclusion **D.1.a.** pursuant to paragraph 2, above, will be subject to all rights of recovery that we may have against you and your partners or "members". You and they, collectively and severally, agree to indemnify us immediately for all such loss, fees, costs and expenses. The foregoing is in addition to any other rights we have under the law or under this policy.

4.  Any payment of loss under this policy involving a transaction intended to qualify as a tax-deferred exchange of property under Internal Revenue Code 1031 is conditioned upon your having complied with the following conditions precedent to coverage:

    a.  A written contractual agreement will be maintained between you as intermediary and each "client" stipulating the manner in which proceeds from the relinquished property will be held and subsequently released by you as intermediary for use in acquiring replacement property.

    b.  Proceeds from the relinquished property or properties of a single exchange transaction will be held in a financial institution account segregated from your operating "funds", and each single exchange transaction shall be identified by a specific file number or similar tracking identification so as to provide a clear paper trail for each exchange transaction or series of related exchange transactions.

    c.  Countersignature will be required for the release of all "funds" or a monthly reconciliation of all accounts involving exchange transaction proceeds will be performed within two weeks of receipt of the account statement. Those reconciliations must be performed by an individual not authorized to deposit, withdraw or transfer funds from the account or be reviewed by an outside CPA.

## United States Fire Insurance Company
## A Delaware Corporation
## Home Office: Wilmington, DE

(A Capital Stock Company)

SIGNATURE

Joseph F. Braunstein, Jr.
President

SIGNATURE

Valerie J. Gasparik
Secretary

FM 206.0.11  07 04